[L.A. No. 29842. In Bank. May 10, 1972.]

VOLKSWAGEN PACIFIC, INC., et al., Plaintiffs and Appellants, v. CITY OF LOS ANGELES, Defendant and Respondent.

50

---

## COUNSEL

Sandler & Rosen and Gerald G. Wolfson for Plaintiffs and Appellants.

Roger Arnebergh, City Attorney, James A. Doherty and Thomas C. Bona-
ventura, Assistant City Attorneys, for Defendant and Respondent.

## OPINION

**THE COURT.**—In this action for a refund of business license taxes levied against them by defendant City of Los Angeles for the years 1963 through 1967, plaintiffs appeal from a judgment denying recovery.

After decision by the Court of Appeal, Second Appellate District, Division One, reversing the judgment of the trial court, we granted a hearing in this court for the purpose of giving further consideration to the issues raised. Having made a thorough examination of the cause, we have concluded that the opinion of the Court of Appeal prepared by Justice Thompson and concurred in by Acting Presiding Justice Lillie and Justice Clark correctly treats and disposes of the issues involved with the exception of the issue of the statute of limitations. Accordingly those portions of the opinion dealing with issues other than that of the applicable statute of limitations are adopted (with some additional discussion of our own) as and for the opinion of this court on such issues. Such portions of the opinion (with appropriate deletions and additions as indicated) are as follows:*

[  ]  Sections 21.00, 21.03, and 21.167 of the Los Angeles Municipal Code, combine to impose a "business tax" upon persons engaged in "selling any goods, wares or merchandise at wholesale" in the City of Los Angeles. The tax is measured by gross receipts from selling activity. The city issued Rulings 13 and 14 implementing the pertinent provisions of the Municipal Code. Ruling 14 states that: "[O]nly those gross receipts which are directly attributable to the business [of selling] engaged in within the City of Los Angeles shall be included within the measure of the tax [on the privilege of selling]." That ruling also provides that: "those receipts which are specified by Ruling 13 for inclusion in the measure of the tax shall be considered directly attributable to business engaged in within the City of Los Angeles." Ruling 13 states in turn that a taxpayer who does not maintain a place of business within the City of Los Angeles "shall nevertheless be deemed to be engaged in business within the City when . . . he carries on within the City of Los Angeles substantial activities in connection with the conduct of his business." Ruling 13 continues that the taxpayer is engaged in business within the city if, as a result of those activities, "he ships

---

*Brackets together, in this manner [  ] *without enclosing material,* are used to indicate deletions from the opinion of the Court of Appeal; brackets *enclosing material* (other than editor's added parallel citations) are, unless otherwise indicated, used to denote insertions or additions by this court. We thus avoid the extension of quotation marks within quotation marks, which would be incident to the use of such conventional punctuation, and at the same time accurately indicate the matter quoted. In so doing, we adhere to a method of adoption employed by us in the past. (See *Chicago Title Ins. Co.* v. *Great Western Financial Corp.* (1968) 69 Cal.2d 305, 311, fn. 2 [70 Cal.Rptr. 849, 444 P.2d 481], and cases there cited.)

or causes personal property to be shipped into the City of Los Angeles, . . ."

Volkswagen Pacific, Inc. (VW) and Porsche Car Distributors, Inc. (Porsche) are related but separate corporations. Both corporations are wholesalers. VW is the sole distributor for Volkswagen automobiles and parts for Southern California, Southern Nevada, Arizona, and Hawaii. Volkswagen automobiles and parts are manufactured by Volkswagenwerk Aktiensellschaft, a German corporation. Volkswagen of America, Inc., a New Jersey corporation, is a wholly owned subsidiary of the German concern and its "franchised sales agent" in the United States.

VW deals with Volkswagen of America pursuant to a written franchise agreement by which it is granted its exclusive territory. Volkswagen of America and VW consult with respect to the establishment of retail dealerships in the exclusive territory of VW. VW approves the plans for the construction of the buildings to be used by a new dealer and provides assistance to the dealer in formulating his plans for his facilities. There are 13 Volkswagen dealers in the City of Los Angeles. Eight of those dealers also sell Porsche automobiles.

In the taxable years here involved, demand for Volkswagen automobiles exceeded supply. Volkswagen of America made a yearly allocation of automobiles to VW, and VW in turn allocated the cars available to it among its dealers. VW furnished IBM order cards to its dealers by which they submitted individual orders specifying model and color. VW contracted for the automobiles necessary to fill those orders with Volkswagen of America which in turn ordered the necessary cars from the German manufacturer. Until June of 1966, VW maintained no inventory of automobiles in the City of Los Angeles and cars were transported to dealers from the port of entry as they were received. Commencing in June of 1966, VW maintained an inventory at the Port of Los Angeles, ranging to a high of 9,000 cars. VW maintains a "five month" inventory of parts at its warehouse in Culver City. Most of those parts are imported from Germany but some are supplied by American manufacturers.

The German concern ships Volkswagen automobiles to the Port of Los Angeles unpackaged, a group of automobiles being included in each shipment. Volkswagen of America notifies VW of each shipment of automobiles destined for the Port of Los Angeles when the shipment leaves Germany. When the shipment arrives at the port, Imported Auto Transport, acting as the agent of Volkswagen of America, places the manufacturer's labels on the automobiles and transports those cars not held in VW's inventory to the dealers to which they have been allocated by VW. At that time, VW pays Volkswagen of America for the automobiles by a bank

transfer of funds. VW is paid by its dealers for each automobile pursuant to a price schedule plus a fixed charge for transportation.

VW acquires Volkswagen parts in a manner similar to the fashion in which it purchases automobiles from Volkswagen of America. Parts are shipped in sea vans however. A sea van is a large container in which packaged or unpackaged merchandise is placed for transport to a ship, loading and transportation as cargo, and eventual shipment to destination. The parts are conveyed in the sea van to VW's warehouse where they are removed and held until delivered to a dealer. Approximately one-half of the parts are delivered to a dealer in the standard package in which they were placed in the sea van and received by VW.

Porsche automobiles and parts are purchased by Porsche directly from the German factory. VW, however, acts as "importer of record," charging Porsche $75 per automobile for the service. In all other respects, Porsche automobiles and parts are processed in the same manner as Volkswagens.

VW and Porsche maintain their office and warehouse in Culver City. Neither has a place of business within the City of Los Angeles, although during some of the period here involved VW warehoused its inventory at the Port of Los Angeles. VW and Porsche each maintains a sales organization consisting of a general sales manager and zone operation managers who assist dealers with their technical, administrative, and sales problems. Each maintains a service organization which assists dealers in resolving service problems. They each maintain a parts representation organization which helps the dealers in their parts distribution. VW employs approximately 250 people at its Culver City facility. Its sales department consists of about 50 employees. Three zone managers, each devoting approximately one-third of his time to the activity, work with dealerships in the City of Los Angeles with their remaining time devoted to dealers outside the city. Two parts representatives of VW, one devoting about nine-seventeenths of his working time to the activity and the other about three-seventeenths of his time, serve dealers in Los Angeles with the remainder of their time devoted to dealers outside the city. Three service representatives, each devoting one-third of his time to the activity, serve dealers in Los Angeles with their remaining time devoted to serving dealers outside the city. VW's total monthly payroll is approximately $166,000. The total payroll of its sales department is $37,200. The monthly payroll allocable to time devoted by zone managers, parts representatives, and service representatives working with Los Angeles dealers is approximately $3,000 per month.

Porsche employs one zone manager and three service representatives. The zone manager devotes approximately 20 percent of his working time

to Los Angeles dealers with the remainder of his time spent on the business of dealers located outside the city. Each of the three service representatives devotes approximately 50 percent of his working time to dealers within the city. Porsche's total monthly payroll is $2,860 and it pays $2,750 per month to VW for use of the latter's facilities and administrative services. The monthly payroll allocable to services performed by the zone manager and service representatives for Los Angeles dealers is $750.

Pursuant to sections 21.00, 21.03 and [   ] [21.166], as interpreted by Rulings 13 and 14, respondent City of Los Angeles assessed business license taxes for the years 1963 through 1967 against appellants VW and Porsche. It measured the tax by the total of the gross receipts of each of appellants from the sales to Los Angeles dealers applying the pertinent tax rate to those receipts. The taxes, together with penalties and interest also assessed by respondent, were paid. On April 27, 1967, appellants filed the complaint in the case at bench.[1] The case was submitted to the trial court upon stipulated facts. That court found that all taxes, interest, and penalties were properly assessed against appellants and entered its judgment that they "take nothing" by their complaint. This appeal followed.

Appellants contend: (1) the tax as assessed is barred by the import-export clause of the United States Constitution and also because it imposes an unconstitutional burden upon interstate commerce; (2) the tax is improperly assessed because appellants do not conduct substantial business in the City of Los Angeles; (3) the tax as assessed includes within its measure gross receipts not attributable to selling activities within the city; and (4) penalties upon the 1965 business license tax were improperly assessed and collected. Respondent counters with the contention, also asserted in its answer, that refund of the taxes paid is barred by the statute of limitations. We conclude: (1) assessment and collection of the taxes is not barred by the import-export and commerce clauses of the United States Constitution; (2) appellants were properly held to be conducting substantial business within the City of Los Angeles; (3) the tax as applied improperly includes within its measure gross receipts not attributable to selling activity within the city; (4) in view of the inclusion of an improper measure of tax by the city, the trial court's findings of fact upon which it based its conclusion that a penalty was properly assessed for the year 1965 are no longer supported by the evidence; [   ].

---

[1]The complaint is in two counts. The first for refund of taxes and the second for declaratory relief. The trial court and the parties have treated the matter as solely a suit for tax refund. We adopt that treatment for the purposes of this appeal.

## Import-Export Clause

■ The import-export clause of the United States Constitution (art. I, § 10, cl. 2) provides: "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection laws: . . ." The clause prohibits a state or local tax upon "the occupation of an importer" (*Brown* v. *Maryland*, 25 U.S. (12 Wheat.) 419, 444 [6 L.Ed. 678, 687]), including a direct tax upon the sale of imports by the importer (*Richfield Oil Corp.* v. *State Board*, 329 U.S. 69 [91 L.Ed. 80, 67 S.Ct. 156]) because the "immunity [of imports from local taxes] survives their arrival in this country and continues until they are sold, removed from the original package, or put to the use for which they are imported." (*Hooven & Allison Co.* v. *Evatt*, 324 U.S. 652, 657 [89 L.Ed. 1252, 1259, 65 S.Ct. 870].) [Original brackets.]

■ We deal here with two broad categories of shipment: parts destined for VW and Porsche and imported in sea vans, and automobiles similarly destined and shipped unpackaged. [    ]

The United States Supreme Court has declared: "In our judgment, the 'original package' . . . was the box or case in which the goods imported were shipped, and when the box or case was opened for the sale or delivery of the separate parcels contained in it, each parcel of the goods lost its distinctive character as an import, and became property subject to taxation by the state as other like property situated within its limits." (*May* v. *New Orleans*, 178 U.S. 496, 508-509 [44 L.Ed. 1165, 1170, 20 S.Ct. 976].) [  ]

[Although the parts were shipped in sea vans, it would not follow as a matter of law that merely because an importing agent removed the parts from the vans, they then lost the constitutional protection of imported articles. Because the size of modern sea vans or "containers" is dictated both by modern shipping technology and by the necessity of reducing the costs of shipping, the opening of such a container by an importer may not necessarily be effected "for the sale or delivery of the separate parcels contained in it" (*May* v. *New Orleans, supra,* 178 U.S. at p. 508 [44 L.Ed. at p. 1170]), but may instead be accomplished so that the importer can by other means of transportation divert his imports to his outlets in different interior states.

In the context of the instant case, however, the opening of the sea van did signify a breaking of bulk "for the sale or delivery of the separate parcels contained in it" (*id.*), so that California governments may properly tax those separate articles. Uncontroverted evidence shows that once the individual packages were removed from the sea van, VW and Porsche distributed those packages to local dealers. Hence, even if VW and Porsche acted

as importers up to the moment that the vans were brought to the warehouse, once they entered the vans to remove the individual packages they did so with the intent and effect to act as wholesalers in "the mass of property in the country . . . ." (*Brown* v. *Maryland, supra,* 25 U.S. at p. 441 [6 L.Ed. at p. 686].) Therefore, they cannot avail themselves of the constitutional immunity from local taxation.]

A more difficult problem exists with respect to the automobiles. They are not shipped in packages, crates or boxes. Thus it is neither possible nor desirable that the validity of the tax here imposed be determined by an artificial effort to create a hypothetical "original package." "[T]he test of the original package is not an ultimate principle. It is an illustration of a principle. [Citation.] It marks a convenient boundary and one sufficiently precise save in exceptional conditions." (Where packaging is inherently impossible or impracticable, an imported, unpackaged item loses its immunity from state or local taxation when it is removed from an aggregate of other similar unpackaged items imported as a unit with it.) (*Baldwin* v. *G.A.F. Seelig,* 294 U.S. 511, 526-527 [79 L.Ed. 1032, 1040, 55 S.Ct. 497, 101 A.L.R. 55]; see also *E. J. Stanton & Sons* v. *County of L.A.,* 78 Cal.App. 2d 181 [177 P.2d 804], hg. den., cert. den. 332 U.S. 766 [92 L.Ed. 352, 68 S.Ct. 75], lumber imported unpackaged held subject to local tax when removed from aggregate of lumber imported by ship and stacked at a local yard; see also *Simon* v. *County of Los Angeles,* 141 Cal.App.2d 74, 78-79 [296 P.2d 381].) In the case at bench, each automobile was imported unpackaged as part of an aggregate of similarly unpackaged items. Appellants, who claim the immunity from tax and thus bear the burden of establishing the conditions for its existence, have failed to prove that packaging of the automobiles was possible or practicable. Similarly, they have failed to prove that any practical or possible method of packaging would not have been one which of necessity would have required removal of the automobiles from the package for delivery to the dealers to whom they were sold. We thus determine that the trial court properly concluded that the automobiles here involved were not immune from taxation by the import-export clause of the United State Constitution.

There is an alternate, equally persuasive basis for sustaining the tax imposed upon gross receipts from sales by VW. The trial court found that VW is not the importer of Volkswagen automobiles in the constitutional sense and concluded that any immunity from tax created by the import-export clause of the Constitution terminated at the time of the sale by Volkswagen of America to VW. That finding and conclusions are supported by the stipulation of facts and by the law.

The constitutional immunity from taxation granted imports exists only

until they are sold or put to the use for which they are imported. (*Hooven & Allison Co. v. Evatt, supra,* 324 U.S. 652.) Here the Volkswagen automobiles were imported by Volkswagen of America, a New Jersey corporation which sold them to VW. Any immunity pursuant to the import-export clause terminated when the imported automobiles were so sold. Appellants rely upon language in *Hooven & Allison* that one who places a contract of purchase with a foreign supplier through a broker is himself the importer rather than the broker because the contract is "the inducing and efficient cause of bringing the merchandise into the country, . . ." (*Id.* at p. 661 [89 L.Ed. at p. 1261].) That reliance is misplaced. The brokerage situation is distinguishable from the case at bench. In the case of a purchase through a broker, there is no local sale in form or substance which terminates the import immunity. Here there is. Volkswagen of America acts for its own account as a seller to VW and not as an intermediary in a transaction between the German manufacturer and VW.[2]

### Commerce Clause

■ Appellants contend that imposition of the Los Angeles license tax on their Los Angeles sales is precluded by article I, section 8 of the United States Constitution which provides: "The Congress shall have power . . . . To regulate commerce with foreign nations, and among the several States . . . ." since their Los Angeles activities are an integral part of foreign or interstate commerce. Appellants point out that their only activities in the City of Los Angeles are to clear goods through customs, arrange for transportation of goods to their dealers or warehouse and to send representatives to their dealers in the city and contend that the sum total of these activities fail to add up to sufficient severable local incidents to support the Los Angeles tax, citing *General Motors Corp.* v. *Washington* (1964) 377 U.S. 436 [12 L.Ed.2d 430, 84 S.Ct. 1564].

The fatal flaw in this chain of reasoning is to look exclusively to appellants' contacts with the City of Los Angeles to determine the question of sufficient local incidents. Appellants, both California corporations, maintain their main office and warehouse in Culver City, California, from which they manage their wholesale distributorship of automobiles and parts. It is clear that this business, domiciled in California, has sufficient local incidents to be taxable, even though the business includes elements of interstate and foreign commerce. (*General Motors Corp.* v. *Washington,*

---

[2]Appellants fasten on that portion of the stipulated facts declaring that Volkswagen of America is the sales agent for the German concern. That conclusionary language must, however, be read in context with the specific portions of the stipulation detailing the manner in which the transactions are consummated.

*supra,* 377 U.S. 436.) Appellants undertake the above listed business activities in the City of Los Angeles as an integral part of the California-based distributorship.

In *Barker Bros., Inc.* v. *Los Angeles* (1938) 10 Cal.2d 603, 609 [76 P.2d 97], this court upheld this very Los Angeles City license tax as applied to sales occurring within the city, since the burden it imposes on interstate commerce is an indirect burden only. The real thrust of appellants' argument is that the portion of their interstate business which occurs in California is unduly burdened because it is subjected to unapportioned double taxation, once in Culver City and once in Los Angeles. Since we hold, *infra,* that the Los Angeles City tax must be apportioned so as not to include extraterritorial activities, the claim of undue burden on interstate commerce fails. [   ]

### Application of the Tax

■   Appellants contend that the Los Angeles license tax is inapplicable on its face because they do not engage in substantial selling activity within the city and that in any event the tax is improperly applied to them because that application includes, within the measure of tax, receipts not attributable to activity within the city.

Appellants support their contention that their activities within the city are not substantial by arguing that those activities represent only a small portion of their entire multi-state and multi-city business. The language of the pertinent provisions of the Los Angeles Municipal Code, however, fastens tax upon substantial activity within the city irrespective of activity outside it. The test is not comparative with activity elsewhere but is a qualitative one based upon in-city activity.

■   Appellants must, however, prevail in their contention that the Los Angeles tax as administered is invalid in that it includes within its measure receipts not attributable to activity within the city. [   ] [In considering these very sections of the Los Angeles Municipal Code, we have held: The requirements of due process and equal protection compel an apportionment of receipts attributable to the business carried on within and without the city.] (*City of Los Angeles* v. *Belridge Oil Co.,* 48 Cal.2d 320, 323 [309 P.2d 417]; see also *City of Los Angeles* v. *Shell Oil Co.,* 4 Cal.3d 108 [93 Cal.Rptr. 1, 480 P.2d 953]; *General Motors Corp.* v. *City of Los Angeles,* 5 Cal.3d 229 [95 Cal.Rptr. 635, 486 P.2d 163].) The taxpayer who challenges a method of apportionment of a local tax bears the burden of showing that extraterritorial values are being taxed. (*City of Los Angeles* v. *Shell Oil Co., supra,* at p. 126.)

The record here establishes that appellant taxpayers have met their burden of showing that extraterritorial values are being taxed. Respondent city included within the measure of tax assessed against appellants the gross receipts from all sales made by them to dealers located in Los Angeles. The stipulation of facts filed in the case at bench details the functions of appellants' out-of-city office and employees. It establishes that the major portion of selling activity which eventually results in delivery of automobiles to dealers in Los Angeles occurs outside the city. Thus for example, employees of VW, accounting for a monthly payroll of $3,000, serve Los Angeles dealers and are supported by an organization located outside the city with a total monthly payroll of $166,000. The bulk of that $166,000 payroll compensates persons who are not engaged in selling and thus must be inferred to be in general support of selling activity wherever it occurs. The same situation prevails in the case of Porsche.

[ ] [In *General Motors Corp.* v. *City of Los Angeles, supra,* 5 Cal.3d 229, we considered a similar factual situation, involving retail rather than wholesale sales.] There a taxpayer, which had no place of business within the city, sold and delivered trucks to customers in the City of Los Angeles as the result of in-city solicitation. The court, in holding that a license tax measured by total gross receipts from the Los Angeles sales improperly included within its measure extraterritorial values, stated: "Thus, for instance, it is undisputed that the sales personnel who engage in selling within the City maintain their offices at the out-of-city retail outlet; that orders are accepted and payment received at the out-of-city retail outlet; and that new vehicles are often initially delivered from the factory to the retail outlet and subsequently delivered from that point to the in-city customer. The City's application of Ruling 14 to this category of transactions—which purports to reach total *unapportioned* gross receipts solely because the vehicles are shipped into the City—is violative of the constitutional principles explained in *Shell* because it refuses to take cognizance of the out-of-city elements of the transactions." (5 Cal.3d 229, 244.)

Analogy to *General Motors* dictates that we conclude in the case at bench that the city's application of Ruling 14 to the transactions here considered, in a fashion which purports to reach to total unapportioned gross receipts solely because the automobiles are shipped into the city, is similarly invalid. The matter at bench must thus be reversed so that the trial court may, on retrial, apply the standards enunciated in *Shell* and *General Motors* which were not available to it when the matter was initially decided.

### Penalty

Appellants contend that the trial court improperly sustained the assessment by respondent of penalty for failure to pay its 1965 license tax. Since

we have now concluded that the original assessments of tax were improper and must be redetermined, it is necessary also that the propriety of the penalty also be redetermined on retrial.   [   ]

This concludes the portions of the opinion of the Court of Appeal adopted by this court. We now proceed to discuss the remaining issue presented to us.

Since it appears reasonably probable that the question of the applicable statute of limitations will be raised upon the retrial of this action,[3] we discuss this issue for the guidance of the court upon retrial.   ■   The availability of the defense of bar under the statute of limitations upon retrial will depend upon the discretion of the trial judge. In *Estate of Horman* (1971) 5 Cal.3d 62 [95 Cal.Rptr. 433, 485 P.2d 785], this court held that since an unqualified reversal upon appeal sets the case at large, as if it had not been tried, the pleadings may be amended in the discretion of the trial court, to assert the statute of limitations as a defense, even if it was not pleaded in the first trial. We do not presume to direct the trial court as to how its discretion should be exercised upon our remand of the instant case. We merely set forth our determination as to the statute of limitations which will be applicable in the event the trial court, in the proper exercise of its discretion, rules that the bar of the statute may be raised.

■   The city asserts that the applicable period of limitations is the six-month period prescribed by section 945.6 of the Government Code[4] which

---

[3]In its answer the city asserted as an affirmative defense that the cause of action for a refund of the taxes was barred by section 339, subdivision 1, of the Code of Civil Procedure. Upon appellants' appeal from the judgment denying refund, the city again urged this defense. The Court of Appeal did not reach the question since it affirmed the judgment. But it did indicate that it thought Government Code section 945.6 was the applicable statute of limitations. Thereafter we granted appellants' petition for a hearing and transferred the cause to the Court of Appeal for reconsideration in the light of our opinion in *City of Los Angeles* v. *Shell Oil Company* (1971) 4 Cal.3d 108 [93 Cal.Rptr. 1, 480 P.2d 953]. We later rendered our decision in *General Motors Corp.* v. *City of Los Angeles* (1971) 5 Cal.3d 229 [95 Cal.Rptr. 635, 486 P.2d 163] which dealt with questions of the applicability of the Los Angeles business license taxes related to those considered in *Shell*. Upon further consideration of the instant cause in the light of both *Shell* and *General Motors,* the Court of Appeal concluded that Code of Civil Procedure section 338, subdivision 1, was the applicable statute of limitations contrary to its previous indication that Government Code section 945.6 was the applicable statute and despite the city's contention to that effect. In view of the foregoing history, it seems reasonably probable that the city will attempt to assert this affirmative defense on remand and will urge section 945.6 as the applicable statute.

[4]Section 945.6, subdivision (a), which was added in 1963 (Stats. 1963, ch. 1715, p. 3383, § 2), as amended in 1965 (Stats. 1965, ch. 653, p. 2015, § 19) reads as follows: "(a) Except as provided in Sections 946.4 and 946.6 and subject to subdivision (b) of this section, any suit brought against a public entity on a cause of action for which a claim is required to be presented in accordance with Chapter 1

is found in division 3.6 of such code entitled "CLAIMS AND ACTIONS AGAINST PUBLIC ENTITIES AND PUBLIC EMPLOYEES." (§§ 810-996.6.)[5]

The Law Revision Commission comment to section 945.6 clearly illustrates the intent and meaning of this section: "This section requires that an action must be commenced within six months after the claim is acted upon or deemed to be rejected. The normal statute of limitations will not apply. The section applies only to claims that are required to be presented in accordance with Chapters 1 and 2 of Part 3. See new sections 905 to 905.6." Section 905[6] provides that all claims for money or damages against local public entities must be presented in accordance with chapters 1 and 2 of part 3 except, as here relevant, claims for tax refund under the "Revenue and Taxation Code or other *statute*" (italics added) prescribing procedures for the refund of any tax. The claim in the instant case is a claim for money in the form of a tax refund against the City of Los Angeles under procedures prescribed not in the Revenue and Taxation Code but in the Los Angeles City Charter (Charter, § 376, Stats. 1927, ch. 9, pp. 2008, 2014) and by ordinance of the City of Los Angeles (Los Angeles Municipal Code, § 21.07). This claim would thus be excepted, if "statute" as used in this section includes ordinance and charter provisions.

---

(commencing with Section 900) and Chapter 2 (commencing with Section 910) of Part 3 of this division must be commenced within six months after the date the claim is acted upon by the board, or is deemed to have been rejected by the board, in accordance with Chapters 1 and 2 of Part 3 of this division." Since, most of the claims involved in this action, accrued after the 1965 amendment, the statute as quoted would be the applicable version. However, if the trial judge were to find any of the claims involved in this matter accrued prior to the 1965 amendment, then the original 1963 version should be applied; that is without the following language: "Sections 946.4 and 946.6 and subject to."

We reject appellants' contention that the applicable version of section 945.6, subdivision (a) is as amended in 1970 for two reasons. First, section 24, Statutes 1970, chapter 104 provided that the amendments to section 945.6 "shall not apply to claims presented to a public entity prior to January 1, 1971." All claims involved in this matter were presented prior to January 1, 1971. Second, in *Douglas Aircraft Co.* v. *Cranston* (1962) 58 Cal.2d 462 [24 Cal.Rptr. 851, 374 P.2d 819] this court held that an amendment extending the period of limitations would not act to revive a claim barred by the original period unless the Legislature specifically so provided. All claims involved in this action were apparently barred by the original period and the Legislature, as indicated above, specifically refused to allow revival of claims presented prior to January 1, 1971.

[5]Hereafter, unless otherwise indicated, all section references are to the Government Code.

[6]Section 905 provides in relevant part: "There shall be presented in accordance with Chapter 1 (commencing with Section 900) and Chapter 2 (commencing with Section 910) of this part all claims for money or damages against local public entities except: [Par.] (a) Claims under the Revenue and Taxation Code or other statute prescribing procedures for the refund, rebate, exemption, cancellation, amendment, modification or adjustment of any tax, assessment, fee or charge or any portion thereof, or of any penalties, costs or charges related thereto."

Section 810, also found in division 3.6, provides: "Unless the provision or context otherwise requires, the definitions contained in this part govern the construction of this division." Section 810.6 provides: " 'Enactment' means a constitutional provision, statute, charter provision, ordinance or regulation." Section 811.8 provides: " 'Statute' means an act adopted by the Legislature of this State or by the Congress of the United States, or a statewide initiative act." As previously noted, section 905, subdivision (a) occurs within division 3.6. Thus, "statute" does not refer to ordinance or regulation unless the context of section 905, subdivision (a), "otherwise requires." There is nothing in the legislative history to suggest that "statute" within section 905, subdivision (a), is to have a special meaning unique to that section. It would appear that if the Legislature intended to except all tax refund actions, rather than just those arising under state law, it would have used "enactment" rather than "statute."

Moreover, even if section 905, subdivision (a) is read to except all tax refund actions, the claim in the instant case is still governed by section 945.6. The Law Revision Commission comment to section 905 directs us to "[s]ee new Section 935 for procedure for claims excepted from Chapters 1 and 2." Section 935 provides in pertinent part: "(a) Claims against a local public entity for money or damages which are excepted by Section 905 from Chapter 1 . . . and Chapter 2 . . . and which are not governed by any other statutes or regulations expressly relating thereto, shall be governed by the procedure prescribed in any charter, ordinance or regulation adopted by the public entity.  [Par.]  (b)  The procedure so prescribed may include a requirement that a claim be presented and acted upon as a prerequisite to suit thereon. *If such requirement is included,* any action brought against the public entity on the claim shall be subject to the provisions of Section 945.6 and Section 946."[7] (Italics added.)

---

[7]Section 935, subdivision (d), provides that the procedure prescribed by charter or ordinance "may not provide a longer time for the board to take action upon any claim than the time provided in Section 912.4." Section 912.4 provides that the board must act within 45 days after the claim has been presented. The Los Angeles Charter (§ 363, Stats. 1941, p. 3487) provides that the board has 90 days to act after the claim has been presented.

The provisions of section 935, subdivision (d), must control, as the filing of claims for money or damages against California government units is an area of statewide concern in which the Legislature has occupied the entire field (*Eastlick* v. *City of Los Angeles* (1947) 29 Cal.2d 661 [177 P.2d 558, 170 A.L.R. 225]). Section 313 of the Code of Civil Procedure provides: "The general procedure for the presentation of claims as a prerequisite to commencement of actions for money or damages against the State of California, counties, cities, cities and counties . . . and against the officers . . . thereof, is prescribed by Division 3.6 (commencing with Section 810) of Title 1 of the Government Code." The Law Revision Commission comment to the 1965 amendment to section 935 makes it clear the Legislature intended to occupy the field: "Taken together, these several sections provide with respect to

As indicated, *supra,* the city prescribes that a claim be presented as a prerequisite to suit for tax refund. (Charter, p. 376, Stats. 1927, ch. 9, pp. 2008, 2014.) Therefore section 945.6 applies and requires that the action for tax refund be brought within six months after the claim is acted upon or deemed to be rejected.

Thus, whether section 905, subdivision (a), is read to either exclude or include the instant tax refund action, section 945.6 provides the applicable statute of limitations. This result apparently reflects the legislative intent, as evidenced by the Law Revision Commission comment to the 1965 amendment to section 935: "Taken together, these several sections provide *with respect to all claims*—whether governed by statute, by contract procedures or by local charter or ordinance provisions—that: . . . (3) Where prior presentation and rejection of a claim is required as a prerequisite to commencing a suit, *a uniform six-month period of limitations is applicable.*" (Italics added.)

The judgment is reversed and the cause is remanded for further proceedings in conformity with the views herein expressed.

all claims—whether governed by statute, by contract procedures or by local charter or ordinance provisions—that: . . . (2) The board may not be given more than 45 days after presentation to act on a claim (unless the period for consideration is extended by agreement)."