[Civ. No. 1958. Fifth Dist. Apr. 7, 1975.]

SINGER COMPANY, Plaintiff and Respondent, v.
COUNTY OF KINGS, Defendant and Appellant.

## COUNSEL

Allen C. Wait, County Counsel, for Defendant and Appellant.

John H. Larson, County Counsel (Los Angeles), and James Dexter Clark, Deputy County Counsel, as Amici Curiae on behalf of Defendant and Appellant.

Johnston, Klein, Horton, Solomon & Baker, V. Judson Klein and Richard G. Polse for Plaintiff and Respondent.

Baker, Ancel & Redmond, Stein & Shostak and Gerald T. Manpearl as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**FRANSON, J.—**

### STATEMENT OF CASE

Respondent filed claims with appellant for refund of ad valorem unsecured personal property taxes of $32,190.57 for the tax years 1965, 1966, 1967, 1968 and 1970. The claims alleged that appellant had illegally assessed and collected taxes on goods imported into this country by respondent and stored at its regional warehouse at Armona, California.

Appellant denied the claims, and respondent filed suit to recover the taxes. Appellant answered, denying that the goods were immune from taxation as imports and alleged as an additional defense that respondent's claim for refund for the years 1965, 1966 and 1967 was barred by the statute of limitations.

The trial court entered findings of fact and conclusions of law and judgment in favor of respondent on all issues.

### FACTS

Respondent operates a regional warehouse at Armona in Kings County, California. The warehouse services two smaller warehouses in California and about 170 of respondent's retail stores in California, Nevada, Hawaii and Arizona.

On the relevant tax dates, respondent's warehouse contained merchandise manufactured in the United States (the property taxes paid by respondent on that merchandise are not in dispute) and between 5,000 and 10,000 cartons of imported items, all of which were brought into the United States by respondent for the purpose of sale to consumers through respondent's retail outlets. The imported merchandise consisted of sewing machines manufactured in Scotland, Italy, France, Germany and Japan, home entertainment items, e.g., radios, phonographs, television sets and tape recorders manufactured in Japan, and wooden storage cabinets manufactured in Norway.

All of the imported sewing machines were manufactured by foreign subsidiary companies of respondent. The Japanese home entertainment

items and the Norwegian storage cabinets were manufactured by independent manufacturers in those countries. In the case of the sewing machines and the Norwegian storage cabinets, respondent was the importer of record for customs purposes; it controlled the products from the moment they left the factory until a retail sale was made in this country.

As to the Japanese home entertainment products, a Japanese trading company known as C. Itoh & Co., Ltd., served as an intermediary between respondent and the Japanese manufacturer; such a trading company was required by Japanese trade practices.

Itoh approached suppliers in Japan "with requirements given to them by the Singer Company, trying to find the products for the Singer Company." Itoh had no discretion to dispose of the cartons to anyone other than Singer and its function "[was] merely to perform an accommodation service as an expert in Japanese law and customs formalities." The manufacturing specifications prescribed by respondent were "very detailed" and all of the merchandise, from the time that it was shipped from the factory, was labeled with respondent's name. At all times respondent rather than Itoh controlled the disposition of the merchandise. The trial court found that respondent was "the inducing and efficient cause of bringing into this country all of the foreign manufactured goods which pass through the Armona warehouse including the home entertainment items imported from Japan."

The packaging and transportation of the goods from the factories overseas to respondent's warehouse can be described as follows: all of the items were placed, at the factory, in rectangular cartons of heavy duty cardboard; protective inner packing, such as styrofoam or plastic sheeting, was placed inside the carton with the merchandise and the carton was sealed with glue, heavy sealing tape or staples. The packaging was in accordance with a longstanding commercial custom regarding this type of merchandise.

The cartons, weighing about 50 pounds each, were hauled overland from the factory by truck-trailer to a shipping port or airport for transportation to the United States. The cartons were loaded aboard ship by various means, depending upon the shipping company involved. Sometimes the cartons were taken out of the trailer and lifted by crane aboard ship on pallets, in slings or in nets. When this happened the individual cartons were stored loose aboard ship for the journey to this

country; this method was used for transporting the French and German sewing machines and, for a period of time, the Norwegian storage cabinets.

In some instances, the trailers in which the cartons were hauled from the factory were loaded, with their wheels removed, directly aboard ship by crane. This occurred if the shipping company happened to own the trailer. This method was used to ship the sewing machines from Italy, Scotland and Japan and also was used for the later shipment of storage cabinets from Norway.

Whenever the cartons were placed aboard ship in the trailers, the trailers, with wheels added in the United States, were used to haul the cartons to respondent's warehouse. After the trailer was unloaded it was returned to the shipping company that owned it.

If the cartons were not placed aboard ship in a trailer, but were lifted aboard on pallets, slings or nets, when they reached the United States they were lifted out of the ship on pallets, slings or nets and were loaded into an American truck-trailer to finish their journey to the warehouse.

On the relevant tax dates, the imported merchandise in the Armona warehouse was in the sealed factory cartons with the exception of about eight to ten "master" cartons which at one time may have been opened to extract inner reshippable cartons of home entertainment items. The contents of these broken master cartons never represented more than $1,000 in full cash value and the property taxes on them would be only $15 per year. The trial court recognized the taxability of these items and deducted $75 from respondent's refund claim.

While in the warehouse, the merchandise was stored on pallets or "slip sheets" in stacks separated by aisles. A slip sheet is a number of boxes which are bound together by bands. The cartons for any given model were grouped together in stacks separate from other models to facilitate inventory control and the filling of shipment orders. The outside of each carton was marked to readily identify the model and country of origin. Although the cardboard cartons were not opened at the warehouse the bands on the slip sheets were broken when the warehouse received an order from New York. Based on this evidence, the trial court found that "the imported merchandise is clearly segregated in separate stacks from the other contents of the warehouse" and there "is no commingling of

imported and domestically manufactured goods within the Armona warehouse."

No retail sales or retail deliveries were made from the warehouse. The retail stores placed their requests for merchandise with respondent's New York headquarters which in turn told the warehouse what shipments to make.

When goods were shipped from the warehouse to one of the smaller warehouses or to a retail store, they were carried by truck-trailer in the factory cartons in which they were imported; they remained in the sealed cartons until sold and the customer's credit had been verified. At that point, the carton was opened and the machine was "stitched in" by the store personnel to make sure it was operating properly.

### TAX IMMUNITY OF GOODS
### WHILE IN WAREHOUSE

The import-export clause of the federal Constitution provides: "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its Inspections Laws; . . . " (U. S. Const., art. I, § 10, cl. 2.)

■ The clause prohibits a local tax upon the "occupation of an importer." (*Brown* v. *Maryland,* 25 U.S. (12 Wheat.) 419, 444 [6 L.Ed. 678, 687].) "It is sufficient . . . to say, generally, that when the importer has so acted upon the thing imported that it has become incorporated and mixed up with the mass of property in the country, it has, perhaps, lost its distinctive character as an import, and has become subject to the taxing power of the state; but while remaining the property of the importer, in his warehouse, in the original form or package in which it was imported, a tax upon it is too plainly a duty on imports to escape the prohibition in the constitution." (*Brown* v. *Maryland, supra,* 25 U.S. at pp. 441, 442 [6 L.Ed. at p. 686]; see also *Dept. of Revenue* v. *James Beam Co.* (1964) 377 U.S. 341 [12 L.Ed.2d 362, 84 S.Ct. 1247, 1248]; 71 Am.Jur.2d, State and Local Taxation, § 120.)

■ Goods lose their character as imports and become "mixed up with the mass of property in the country" when the importer sells them, removes the goods from the "original package," or puts the goods to the use for which they were imported. (*Hooven & Allison Co.* v. *Evatt,* 324 U.S. 652, 657 [89 L.Ed. 1252, 1259, 65 S.Ct. 870, 873].)

Appellant concedes that except as to the home entertainment items from Japan, all of the goods retained their status as imports upon arrival at the Armona warehouse. As to the home entertainment items, however, appellant contends that respondent purchased the goods from C. Itoh & Co., Ltd. after they arrived in this country and that the sale terminated their import status, citing *Brown* v. *Maryland, supra,* and *Volkswagen Pacific, Inc.* v. *City of Los Angeles,* 7 Cal.3d 48 [101 Cal.Rptr. 869, 496 P.2d 1237]. ■ However, "For the purpose of determining whether petitioner was the importer in the constitutional sense, it is immaterial whether the title to the merchandise imported vested in him who caused it to be brought to this country at the time of shipment or only after its arrival here." (*Hooven & Allison Co.* v. *Evatt, supra,* 324 U.S. 652, 662 [89 L.Ed. 1252, 1262, 65 S.Ct. 870, 876].)

In *Hooven,* the petitioner was not the importer of record, having paid for the merchandise and acquired title to it only after it had arrived in this country. (324 U.S. at p. 661 [89 L.Ed. at p. 1261].) Nevertheless, the court concluded that he was the importer in the "constitutional sense" because he was "the inducing and efficient cause of bringing the merchandise into the country." (324 U.S. at pp. 661, 664 [89 L.Ed. at pp. 1261, 1263].) It was noted by the court that the petitioner had contracted for the purchase of the goods which were identified and appropriated to the purchase contract from the moment they left the country of origin, and the performance of the contract necessarily resulted in importation of the merchandise into the United States. (324 U.S. at p. 661 [89 L.Ed. at p. 1261].)

In *Volkswagen Pacific, Inc.* v. *City of Los Angeles, supra,* 7 Cal.3d 48 at page 57, an American subsidiary (VW of America) of the German company which manufactures Volkswagen automobiles was held to be the importer of certain automobiles because the subsidiary company decided which autos should be imported and which should be sold to the wholesaler (VW), who was the taxpayer before the court. *Volkswagen* distinguished *Hooven* in holding that the subsidiary (VW of America) was not merely an "intermediary" or "broker" between the German manufacturer and the wholesaler (VW). The court stated: "The brokerage situation is distinguishable from the case at bench. In the case of a purchase through a broker, there is no local sale in form or substance which terminates the import immunity. Here there is. Volkswagen of America acts for its own account as a seller to VW and not as an intermediary in a transaction between the German manufacturer and VW." (7 Cal.3d at p. 57.) The court noted that the wholesaler (VW) did

not qualify as an importer because it did not control the manufacture of the autos or the specifications for their manufacture, or even the number of autos allocated to them. (7 Cal.3d at p. 52.)

The present case comes squarely within the rationale of *Hooven.* Respondent was the "efficient and inducing" cause for bringing the home entertainment items to the United States. Thus, it was the importer of these goods, and the goods possessed an import status upon their arrival at the warehouse.

Appellant next contends that the goods brought to this country by means of the trailers[1] lost their import status when removed from the trailers, because the trailers constituted the "original package" within the rationale of *Brown* v. *Maryland, supra.*

In *Volkswagen Pacific, Inc.* v. *City of Los Angeles, supra,* 7 Cal.3d 48, 53-56, automotive parts were transported by ship from Germany to the port of entry at Los Angeles in "sea vans" or large containers which are similar to the trailers used in the present case. The Supreme Court stated: "Although the parts were shipped in sea vans, it would not follow as a matter of law that merely because an importing agent removed the parts from the vans, they then lost the constitutional protection of imported articles. Because the size of modern sea vans or 'containers' is dictated both by modern shipping technology and by the necessity of reducing the costs of shipping, the opening of such a container by an importer may not necessarily be effected 'for the sale or delivery of the separate parcels contained in it' (*May* v. *New Orleans, supra,* 178 U.S. at p. 508 [44 L.Ed. at p. 1170]), but may instead be accomplished so that the importer can by other means of transportation divert his imports to his outlets in different interior states." (7 Cal.3d at p. 55.)

---

[1]The "trailers" used in this case are a type of cargo shipping container which is described in Simon, *The Law of Shipping Containers* (1974) 5 J.Maritime L. 507, 513, as follows: "A cargo shipping container is a permanent, re-usable article of transport equipment durably made of metal and equipped with doors for easy access to the goods carried inside. It is designed to facilitate the handling, loading, stowage aboard ship, carriage, unloading and delivery of large numbers of packages of goods contained within, thus minimizing the costs and risks of processing each package individually. 'Containerization' developed as an efficient and economical method of handling and transporting cargo; it provides a means for transferring cargo from one form of transportation, such as ship, to another form of transportation, such as rail or truck, without the necessity of loading and unloading the individual items of cargo each time the mode of transport changes." (See *Sea-Land Service, Inc.* v. *County of Alameda,* 12 Cal.3d 772, 775, fn. 1 [117 Cal.Rptr. 448, 528 P.2d 56].)

■ Thus, whether a sea van or cargo container is merely a means of transportation or whether it constitutes an original package so that its opening causes the goods inside to lose their import status is a fact question to be answered according to the circumstances of each case. In *Volkswagen,* the court held that the opening of the sea vans constituted a "breaking of bulk . . . 'for the sale or delivery of the separate parcels contained in it' " because the uncontroverted evidence showed that once the packages were removed from the van, the wholesaler (VW) distributed those packages to its local dealers. The court stated, "Hence, even if [the taxpayers] acted as importers up to the moment that the vans were brought to the warehouse, once they entered the vans to remove the individual packages they did so with the intent and effect to act as wholesalers in 'the mass of property in the country. . . .' (*Brown* v. *Maryland, supra,* 25 U.S. at p. 441 [6 L.Ed. at p. 686].) Therefore, they cannot avail themselves of the constitutional immunity from local taxation." (7 Cal.3d at pp. 55-56.)

In the instant case, the original cartons were unloaded from the trailers at respondent's warehouse, placed in separate piles according to model number (country of origin), and left there until reloaded onto truck-trailers for delivery to the retail outlets in California and other states. The merchandise remained in the cartons until sold at the retail outlets. Thus, there is substantial evidence to support the trial court's finding that respondent opened the containers only for the purpose of temporarily storing the cartons until they could be delivered to the retail outlets by other means of transportation.[2]

---

[2]Appellant's reliance on *E.J. Stanton & Sons* v. *County of L.A.,* 78 Cal.App.2d 181 [177 P.2d 804] and *Simon* v. *County of Los Angeles,* 141 Cal.App.2d 74 [296 P.2d 381], for the proposition that the shipping container is the "original package" is misplaced. In *E.J. Stanton & Sons,* the taxpayer imported hardwood by ship. The lumber was unloaded and stacked, each shipment separately, in the taxpayer's storage yard and sales were made from the stacks. In rejecting the taxpayer's contention that each piece of lumber was an original package, it was said "[a]lthough a cargo in bulk may arrive at the port of entry in irons, or wrapped and tied with hemp ropes, or encircled with a silken thread or, as a herd of steers, have no binder at all, yet the entire shipment without regard to its exterior wrapper is the original package. . . . " (78 Cal.App.2d at p. 187.) This "package" was broken by the local sales: "[W]hen such cargo sheds its invisible cover, even though in the warehouse of the importer, and is so sorted and classified as to facilitate its sale, and portions thereof are sold until the pile is depleted and the remnants thereof are commingled with new shipments of the same type of timbers, also to be offered for sale," the immunity is terminated. (78 Cal.App.2d at p. 188.) Like the automobiles in *Volkswagen* where separate individual packaging is inherently impossible or impractical, items imported in bulk lose their immunity from local taxation when removed from the aggregate of the items imported as a unit. (7 Cal.3d at p. 56.) In *Simon,* nails imported from Europe in kegs and sacks were exempt from local taxation until the kegs and sacks, being the original package, were opened.

■ Moreover, respondent is not a "wholesaler" of its goods. A wholesaler has been defined as: "One who buys in comparatively large quantities, and who sells, usually in smaller quantities, but never to the ultimate consumer of an individual unit. He sells either to a 'jobber,' a sort of middleman, or to a 'retailer,' who sells to the consumer." (Black's Law Dict. (4th ed. 1957) at p. 1770; *City of Los Angeles* v. *Clinton Merchandising Corp.*, 58 Cal.2d 675, 678-679 [25 Cal.Rptr. 859, 375 P.2d 851].)

Additionally, appellant contends that respondent acted upon the imported goods in the warehouse as a *retailer* thereby causing the goods to lose their tax immunity. It argues that since respondent filled orders from the retail stores upon demand, it was at that time "putting the goods to the use for which they were imported." (*Hooven & Allison Co.* v. *Evatt, supra*, 324 U.S. 652, 656 [89 L.Ed. 1252, 1258-1259, 65 S.Ct. 870, 873].)

■ Where the purpose of importation is the use of the goods by the importer in his own manufacturing process, the goods lose their character as imports when they are committed to the manufacturing process for which they were imported. (*Youngstown Co.* v. *Bowers*, 358 U.S. 534, 542-543 [3 L.Ed.2d 490, 496-497, 79 S.Ct. 383, 388]; *Hooven & Allison Co.* v. *Evatt, supra*, 324 U.S. at pp. 665, 668 [89 L.Ed. at pp. 1263, 1265].) ■ However, when the purpose of importation is sale, as in the instant case, goods stored in a warehouse in their original package are immune from local taxation until they are exposed for sale or sold. (*Low* v. *Austin*, 80 U.S. (13 Wall.) 29, 34 [20 L.Ed. 517, 518-519], reaffirmed in *Dept. of Revenue* v. *James Beam Co.*, 377 U.S. 341, 343 [12 L.Ed.2d 362, 364, 84 S.Ct. 1247, 1248]; *Sterling Liquor Distributors, Inc.* v. *County of Orange*, 3 Cal.App.3d 510, 512-513 [83 Cal.Rptr. 571]; *Price Paper Corporation* v. *City of Detroit*, 42 Mich.App. 488 [202 N.W.2d 523, 525]; *Noll Equipment Co.* v. *City of Detroit*, 49 Mich.App. 37 [211 N.W.2d 257, 258-259]. See also *F. May & Co.* v. *New Orleans*, 178 U.S. 496 [44 L.Ed. 1165, 20 S.Ct. 976, 981].) Respondent exposed the goods for sale only after they reached the retail outlets; hence, while in the warehouse, they were not put to "the use for which they were imported."

Finally, appellant contends that the goods lost their import status because they were mixed with other domestically manufactured property in the warehouse.

In finding that there was no commingling of imported and domestic goods, the trial court properly relied on *Imperial Development Co.* v. *Calexico,* 47 Cal.App. 666 [191 P. 50]. In that case, bales of imported cotton were held immune from California property taxation even though the imported bales were "not all stored in one portion of the warehouse, and . . . [were] stored in a warehouse in which home-grown cotton was also stored." (47 Cal.App. at p. 670.) Because the goods were marked for identification and were in the original bales, the court held that the imported cotton "could not become so mingled with the other goods stored in the warehouse as to lose its character as an import while it continued to be the property of the importer." (47 Cal.App. at pp. 670-671.) (See also *Low* v. *Austin, supra,* 80 U.S. (13 Wall.) 29, where imported wines were stored with wines of home-made manufacture; held immune.) ■ In the present case, respondent marked the imported goods for identification and the goods were still in their original packages; they were not commingled so as to lose their import status.

In summary, the trial court correctly held the imported goods immune from the tax because on the relevant lien dates, respondent had not sold the goods, had not removed them from the original package in which they had been brought to the warehouse and had not put the goods to the use for which they were imported. (*Hooven & Allison Co.* v. *Evatt, supra,* 324 U.S. 652, 657 [89 L.Ed. 1252, 1259]; *Volkswagen Pacific, Inc.* v. *City of Los Angeles, supra,* 7 Cal.3d 48.)

### STATUTE OF LIMITATIONS

Respondent filed property statements and paid taxes on the inventory in its warehouse on the relevant lien dates for the tax years 1965, 1966, 1967, 1968 and 1970.[3] During these years, the assessor accepted the value of the property as listed on respondent's statements. Thereafter, in 1969 and 1970, appellant audited respondent for the years of 1965, 1966, 1967 and 1968; for the years audited, there was a net deficiency assessment of $4,767.21. On June 17, 1970, appellant's assessor notified respondent in writing of the audit findings and assessment.[4] Respondent paid the deficiency amount by check on July 31, 1970.

[3]The "tax year" is a fiscal year commencing July 1 and ending June 30. The lien date is March 1, preceding the fiscal year for which the taxes are levied. (Rev. & Tax. Code, § 2192.) Unsecured property taxes are due on the lien date. (Rev. & Tax. Code, § 2901.) Taxes on the unsecured roll as of July 31, but unpaid, are delinquent August 31. (Rev. & Tax. Code, § 2918.)

[4]Appellant's authority to levy an escape assessment in 1970 for the 1965 tax year is unclear. Under Revenue and Taxation Code section 532 any assessment for property which has previously escaped assessment other than by wilful concealment or fraudulent

As to each year the sequence of events is as follows:

*1965:* Pursuant to respondent's property statement, respondent was assessed taxes in the sum of $7,679.08, which it paid on June 25, 1965. Thereafter, upon audit in 1970, respondent was assessed an additional $4,302.24. This amount was paid in part by applying overpayment credits from 1966 ($1,509.98) and 1967 ($957.28) and $1,834.98 from the July 31, 1970, check.

Respondent claimed a refund from the taxes paid in 1965 in the amount of $3,555.74.

*1966:* Respondent was assessed $21,072.57, pursuant to its property statement, which was paid on June 13, 1966. In the 1970 audit, an overpayment in the amount of $1,509.98 was discovered; this amount was credited to the 1965 deficiency assessment.

Respondent claims refund for taxes paid in 1966 in the amount of $9,054.69.

*1967:* Respondent was assessed $16,953.18 pursuant to its property statement which it paid on June 8, 1967. In the 1970 audit, an overpayment of $957.28 was discovered, which was credited to the 1965 deficiency.

Respondent claims an additional refund of taxes paid in 1967 in the amount of $9,539.42.

*1968:* This year is not in dispute since appellant concedes that the whole of the tax sought to be refunded was paid within the three years prior to filing of the claim for refund.

Respondent paid $10,811.59 in assessment in 1968. In the 1970 audit, it was discovered that respondent owed an additional amount of $2,932.23. This amount was paid by the check of July 31, 1970.

Respondent claims a refund for 1968 in the amount of $7,203.38.

act or omission shall be made within four years after July 1 of the assessment year in which the property escaped taxation. However, respondent has not challenged the timeliness of appellant's assessment of a deficiency for 1965 and we will assume that appellant had such a right.

On August 26, 1970, respondent filed claims for refund in the amount of $29,353.23 for the years 1965 through 1968 and in the amount of $2,837.34 for the year 1970.

Appellant contends that the cause of action for refund of taxes for 1965, 1966 and 1967 is barred by the three-year limitation period of Revenue and Taxation Code section 5097, subdivision (b) as it read on August 26, 1970, when the claim was filed. It further contends that the amounts credited to the 1965 deficiency by way of the overpayments for 1966 and 1967 are not recoverable since the cross-demands are deemed paid as of the time they accrued, which occurred more than three years before the claim for refund was filed. We agree with appellant's contentions.

On August 26, 1970, when respondent filed its claim for the years 1965 through 1968, section 5097, subdivision (b) of the Revenue and Taxation Code provided:

"No order for a refund under this article shall be made except on a claim:

". . . . . . . . . . . . . . . . .

"(b) Filed within three years *after making of the payment sought to be refunded* or within one year after the mailing of notice as prescribed in Section 2635, whichever is later." (Italics added.)

The statute was amended effective November 23, 1970, to enlarge the limitation period to four years. On December 1, 1970, appellant denied the claim.

■ Unless the statute expressly provides to the contrary, any enlargement of a limitation period applies only to matters pending, but not already barred. (*Douglas Aircraft Co. v. Cranston,* 58 Cal.2d 462, 465 [24 Cal.Rptr. 851, 374 P.2d 819, 98 A.L.R.2d 298]; *Mudd* v. *McColgan,* 30 Cal.2d 463, 467-468 [183 P.2d 10].) Stated otherwise, until the limitation period has run it may be extended, but after it has run, a potential defendant may rely upon it in conducting his affairs. (*Douglas Aircraft Co.* v. *Cranston, supra,* at p. 465.) "It is the settled law of this state that an amendment which enlarges a period of limitation applies to pending matters where not otherwise expressly excepted. Such legislation affects the remedy and is applicable to matters not already barred, without

retroactive effect. Because the operation is prospective rather than retrospective, there is no impairment of vested rights." (*Mudd* v. *McColgan, supra,* 30 Cal.2d at p. 468.)

When respondent filed its claim, the three-year limitation period of then section 5097, subdivision (b) had run on the taxes paid in 1967 and the preceding years. Because the claim for those years was barred, the enlargement of the period to four years by statutory amendment effective November 23, 1970, did not extend the time.

Respondent's argument that the four-year provision applies because the critical date under the statute is December 1, 1970, the date of the order denying the refund, rather than the date of filing of the claim, is without merit. The statute explicitly makes the timely filing of a claim within the limitation period a condition precedent to any order for a refund. "A claim for refund of taxes may be made only within the time allowed by statute. [Citation] The controlling statute is that in effect *at the time the claim for refund is filed.*" (Italics added.) (*North Whittier etc. Citrus Assn.* v. *Bryant,* 126 Cal.App.2d 688, 691 [273 P.2d 271]; *Rosefield Packing Co.* v. *Superior Court,* 4 Cal.2d 120, 122 [47 P.2d 716].)

Respondent relies on *McDougall* v. *County of Marin,* 208 Cal.App.2d 65, 69 [25 Cal.Rptr. 107], and certain federal cases (*United States* v. *Clarke,* 69 F.2d 748; *Plankinton* v. *United States,* 164 F.Supp. 912, 917) for the proposition that the date of "payment" from which a claim period runs is the "deadline for payment," in this case, August 31, when the taxes became delinquent, and not the earlier date of remittance. These cases, however, are distinguishable on their facts.

In *McDougall, supra,* the court was dealing with real and personal property taxes on the secured roll, the first half of which was due on November 1 (Rev. & Tax. Code, § 2605) and if unpaid, became delinquent on December 10 (§ 2617); the second half was due on February 1 (§ 2606) and if unpaid, became delinquent on April 10 (§ 2618). The matter was before the court on a general demurrer; it was unclear when the taxes had been paid and whether the taxes had been paid in one or two instalments. It was assumed that the final instalment was paid on or before April 10 of the tax year, and the court applied the rule of *United States* v. *Clarke, supra,* i.e., that the limitation period for filing a claim for refund did not begin to run until the time of the payment of the last instalment.

In *United States* v. *Clarke, supra,* an executor sought refund of a federal estate tax paid in two instalments. The federal statute provided that all claims for refund of taxes alleged to have been erroneously assessed or collected must be presented to the commissioner within three years next "after the payment of such tax." The court held that the Congress, when it used the expression "the tax," did not mean the payment of a portion of the tax and concluded that the limitation period did not begin to run until all the taxes had been paid, which meant the time of the payment of the last instalment. Similarly, in *Plankinton* v. *United States, supra,* the question was whether payments of estimated personal income taxes pursuant to quarterly declarations remitted more than three years before filing of a claim for refund and prior to the filing of the final return (filed within the three-year period) constituted the "payment of tax" within the meaning of the statute. Because the tax obligation for the year was not fixed until the final return was filed, it was held that the statute commenced running at the date of filing of the final return.

*McDougall* and the federal cases are inapposite to the instant case. Here, the unsecured property tax is due on March 1 preceding the taxable year. (Rev. & Tax. Code, § 2901.) The tax is not a tentative nor an estimated payment, nor is it an instalment payment; it is a final tax.

If the Legislature had so intended, it could have provided that the claim for refund should be filed within three years after the delinquent date of the taxes, rather than three years after the time of actual payment. For example, in the Bank and Corporation Tax Law, Revenue and Taxation Code section 26073, it is provided:

"No credit or refund shall be allowed or made after four years from the last day prescribed for filing the return or after one year from the date of the overpayment, whichever period expires later."

Section 25663, subdivision (b) provides in part:

". . . For purposes of section 26073, payment of any portion of the tax made before the last day prescribed for the payment of the tax shall be considered made on such last day."

Thus, it must be assumed that the Legislature had in mind one set of circumstances in enacting the Bank and Corporation Tax Law, which is payable in instalments, as contrasted with the legislative intent in enacting section 5097 involving claims for refund of single payment unsecured property taxes.

■ The language of section 5097, subdivision (b) is clear: the limitation period commences upon "the making of the payment sought to be refunded." Because there is no uncertainty in the language used, we cannot judicially legislate a rule authorizing an order for refund on a claim filed within three years from the date the tax becomes delinquent.[5] Because the taxes for 1965 (other than those paid in 1970 as the result of the deficiency assessment), 1966 and 1967 were paid more than three years prior to the filing of the claim for refund, the claim for those years is barred.

Respondent next contends that the allocation of the credits for the 1966 and 1967 overpayments to the 1965 deficiency in 1970 reopened the limitation period for the taxes paid in 1965. Appellant asserts, however, that Code of Civil Procedure section 440 (now § 431.70) required the court to treat the offsetting claims (the 1965 deficiency and the 1966 and 1967 overpayments) as compensated at the time they arose so that the allocation of credits in 1970 did not extend the statute. We agree with appellant.

■ The right to set off is independent of the right to a refund under section 5097, subdivision (b). Under the setoff rule, each claimant is deemed paid to the extent that the claims equal each other (*Hauger* v. *Gates,* 42 Cal.2d 752, 755 [269 P.2d 609]) and without the necessity of bringing an action on the claims. Because both claims are deemed paid to the extent of the offset, there is no outstanding claim against which the statute of limitations may run. (*Jones* v. *Mortimer,* 28 Cal.2d 627, 632-633 [170 P.2d 893].) Thus, even though in 1970 the statute had run on respondent's right to a refund of its 1966 and 1967 overpayments, respondent was entitled to a credit on the 1965 tax liability for the overpayments when appellant asserted the 1965 deficiency. Under Civil

[5]Respondent's argument that this court should adopt the "federal rule" to give taxpayers who filed and paid earlier than the statutory due date the benefit of a limitations period commencing with the due date "to remove any incentive to pay just prior to a deadline" citing *Plankinton* v. *United States, supra,* is a policy argument properly addressed to the Legislature. Unquestionably, if the Legislature believes that the taxpayer should have the identical period within which to claim a refund as the government has to assess an escape deficiency, then Revenue and Taxation Code section 5097, subdivision (b) should be amended to provide that the four-year period commences on July 1st of the assessment year rather than the date of payment. This would avoid the situation where, as in the case at hand, the taxpayer paid its taxes in June preceding the tax year so that his limitation period for a refund expired in June of the fourth ensuing year, yet the government can assess a deficiency within four years after July 1st of the assessment year.

Code section 1479,[6] appellant was required to apply the credits to the 1965 deficiency rather than to the 1968 deficiency.

Again, if the Legislature had intended that the credit of an overpayment of property taxes in satisfaction of a property tax liability for another year would reopen or extend the limitation period within which a claim for refund could be filed for such tax liability, it could have so provided. For example, Revenue and Taxation Code section 19082.1 (personal income tax) expressly provides: "The credit of an overpayment of any tax in satisfaction of any tax liability shall, for the purpose of any suit for refund of such tax liability so satisfied, be deemed to be a payment in respect of such tax liability *at the time such credit is allowed.*" (Italics added.) We are unaware of any statutory authority for the proposition that the allowance of a credit for overpayment of property taxes as against a tax liability for a year already barred reopens the limitation period for claiming a refund for that year.

Finally, in an attempt to avoid the bar of the statute, respondent contends that, although it made tax remittances in 1965, 1966 and 1967, the taxes for each year were not "finalized" until 1970. The trial court apparently adopted this theory when it concluded "all of the payments which [respondent] seeks to be refunded in this case were made in the summer of 1970."

Again, respondent relies on *McDougall* v. *County of Marin, supra,* and *United States* v. *Clarke, supra,* for its interpretation of when payment occurred so as to commence the running of the three-year statute.

As previously noted, *McDougall* involved instalment payments of taxes on a secured property roll and is inapposite to the question of whether a deficiency assessment for a particular year reopens the limitation period for a refund of the entire tax paid for that year and not just the amount of the deficiency.

*United States* v. *Clarke, supra,* 69 F.2d 748, is not persuasive. In *Clarke,* the executor paid an initial estate tax assessment on March 21, 1929, of $9,161, and, in consequence of a deficiency assessment, paid an additional $4,460 on March 31, 1930. On April 6, 1932, the executor filed

---

[6]Civil Code section 1479 provides that, unless the debtor directs otherwise, where an act of performance is applicable to two or more obligations, the performance shall be applied as follows:
1. Of interest due at the time of the performance.
2. Of principal due at that time.
3. *Of the obligation earliest in date of maturity.*

a claim for refund of the full amount of $13,621. The court held that the three-year statute did not begin to run until the time of payment of the deficiency assessment and the full amount was refunded. Subsequently, however, the federal statute construed in *Clarke* (26 U.S.C. § 910) was amended to provide that only the amounts paid within three years of the claim could be recovered.[7]

Whether an assessment of a deficiency of property taxes for a year already barred by the statute should reopen the limitation period for all property taxes paid in that year is a legislative matter. We find no statutory authority for this proposition.

Respondent's theory that the letter of June 17, 1970, was the "notice" required by Revenue and Taxation Code section 2635, giving it one year after the mailing of the letter to file a claim, was not raised in the trial court and it will not be considered on appeal. (6 Witkin, Cal. Procedure (2d ed.) Appeal, § 281, pp. 4269-4270.)

We hold that respondent's claim for refund should be allowed as follows: $7,203.38 for the tax year 1968; $1,834.98 representing the cash paid in 1970 and allocated to the 1965 taxes; and $2,837.34 paid on the 1970 taxes, for a total of $11, 875.70.

The judgment is reversed. The action is remanded to the trial court with directions to enter findings and a new judgment in accordance with this opinion; each party to bear its own costs on appeal.

Brown (G. A.) and Gargano, J., concurred.

---

[7]In *Brewer* v. *National Life & Acc. Ins. Co.,* 119 F.2d 313, the taxpayer paid a portion of its taxes for 1921, was audited and assessed additional taxes during 1924 which it paid in 1925. Thereafter, during 1925, the taxpayer sought refund of the sum paid in 1925, plus a portion of the taxes paid in 1921. A four-year statute of limitations was applicable, and the portion paid in 1921 was paid more than four years prior to the filing of the refund claim. The trial court followed *United States* v. *Clarke, supra,* and allowed the refund for the sums paid in 1925 and a portion of the amount paid in 1921. However, the reviewing court reversed and held that, under the statute (similar to the one in the present case), "the date of payment of such tax means the date when the specific sum sought to be recovered was paid." (See also *Greenbaum* v. *United States,* 17 F.Supp. 83; *Seiberling* v. *United States,* 22 F.Supp. 397 [87 Ct.Cl. 611], cert. den., 307 U.S. 634 [83 L.Ed. 1516, 59 S.Ct. 1031]; *Lehigh Valley Trust Co.* v. *United States,* 22 F.Supp. 407 [87 Ct.Cl. 631], cert. den., 307 U.S. 634 [83 L.Ed. 1516, 59 S.Ct. 1031].)