**SHELL OIL COMPANY, a Delaware corp.,**
**Plaintiff-Appellant-Cross-Appellee,**

v.

**CITY OF SANTA MONICA, a municipal corp.,**
**Defendant-Appellee-Cross-Appellant.**

**Nos. 86–6103, 86–6206.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 5, 1987.

Decided Oct. 21, 1987.

Edward S. Renwick, Los Angeles, Cal., for plaintiff-appellant-cross-appellee.

Mary H. Strobel, Santa Monica, Cal., for defendant-appellee-cross-appellant.

Before PREGERSON, NELSON and WIGGINS, Circuit Judges.

NELSON, Circuit Judge:

Shell Oil Company appeals from a grant of summary judgment holding (1) that the City of Santa Monica is exempt from the dormant commerce clause under the market participant doctrine in its setting of a franchise fee for an oil pipeline traversing the city and (2) that the state constitution does not bar the fee. Santa Monica cross-appeals from a grant of summary judgment holding that the Hazardous Liquid Pipeline Safety Act, 49 U.S.C.A. §§ 2001–2014 (Supp.1987), preempts Santa Monica from imposing any safety standards in an intrastate pipeline franchise agreement. We have jurisdiction pursuant to 28 U.S.C. § 1291 (1982). We affirm in part and vacate and remand in part.

## BACKGROUND

In 1941, the City of Santa Monica and a predecessor of Shell Oil Company entered into a forty-year franchise agreement to operate an oil pipeline underneath city streets. Santa Monica does not hold a fee interest in the streets; it holds an easement in the streets for street purposes. The 1941 franchise granted Shell's predecessor an exclusive subsurface easement in, under, along, and across certain public streets. It provided that the grantee would comply with all ordinances, rules, or regulations then or thereafter adopted by the Santa Monica City Council. The franchise did not include any provision for renewal. Today, Shell owns, operates, and maintains the pipeline.

The entire pipeline traverses 82.2 miles from Ventura County, California, to Shell's Wilmington refinery in Los Angeles County, California. The portion within Santa Monica totals 3.9 miles. The ten-inch diameter pipe enters the northeast corner of the city and runs roughly north to south, parallel to the coast, a few blocks inside Santa Monica's eastern boundary with the City of Los Angeles. For the most part, the pipe lies approximately forty-eight inches below the surface of the street. It runs within some fifty feet of the city's water well # 6, passes by the San Vicente reservoir, intersects several storm drains flowing west to the sea, and crosses over the Santa Monica Freeway (Interstate 10). The area the pipe traverses is heavily residential and commercial. Under the franchise agreement, Shell paid Santa Monica a total annual fee of $1,029.60, based on a formula of $.005 per inch internal diameter per linear foot of pipe.

As of 1985 and early 1986, the Ventura pipeline carried in excess of 32,000 barrels of crude oil per day. All of Shell's drilling sites are onshore in California. Pursuant to "exchange agreements," however, Shell also acquires title to oil drilled by other oil companies on the outer continental shelf and transmits the combined oil through the pipeline. Shell thus holds title to all of the oil while in the pipeline. Approximately 89% of the pipeline's oil is then delivered to Shell's Wilmington refinery, accounting for 24% of the refinery's input. Some of the fuel produced at the refinery is delivered to suppliers in Nevada and Arizona. The remaining 11% of the crude oil carried in the pipeline is distributed to the other oil companies from whom Shell acquired title under the exchange agreements.[1]

Prior to the expiration of the agreement in 1981, Santa Monica and Shell commenced negotiations for a new franchise agreement. In May 1981, Shell proposed an annual fee of $8,514.51, which Santa Monica rejected. After commissioning a firm to appraise the fair rental value of the route, Santa Monica proposed a flat fee of $237,000 per year (with inflation escalators). This amount was based on a five-foot wide subsurface right of way valued at a rate corresponding to 50% of the abutting surface land value, assessed at an annual 12.5% rate of return. Shell countered with a figure of $10,000 to $12,500 per year, based on its own firm's appraisal of pipe-

---

1. Shell does not claim that it is a common carrier or public utility that would be both subject to PUC regulation and vested with the power of eminent domain. *See* Cal.Pub.Util.Code §§ 610, 615 & comments, 211, 216, 228 (West 1975 & Supp.1987).

line franchise fees with numerous other California cities.[2]

The parties also disagreed over the inclusion of safety standards in the proposed franchise agreement. The engineering firm retained by Santa Monica noted three prior ruptures in the Ventura pipeline, resulting in spills of 4,337 barrels of crude oil, and analyzed the risks and consequences of future ruptures. *See* NDE Technology, Inc., *Safety Study for the Section of the Shell Oil Ventura 10–Inch Crude Pipeline* (November 1981). In view of the age of the pipeline, its special physical characteristics,[3] and the high density residential and commercial areas it traverses, the NDE report recommended numerous safety improvements, which Santa Monica proposed to include in the franchise agreement. The firm retained by Shell to conduct a safety analysis, while acknowledging the possibility of accidents, emphasized the safety record of the Ventura pipeline, disputed some aspects of the NDE report, and generally presented a more optimistic view of the potential risks. *See* Bechtel Petroleum, Inc., *Santa Monica Segment Shell Ventura Crude Oil Pipeline* (February 1982). Shell objected to the inclusion of any safety standards in the franchise.

To date, the parties have not signed a new franchise agreement. Interim agreements have allowed Shell to continue to use the substreet easement, apparently at a fee of approximately $10,000 or $11,000 per year.

On May 14, 1982, two days prior to the expiration of one of the interim agreements, Shell filed a complaint in federal district court. Shell sought declarations that (1) the proposed fee would unreasonably burden interstate commerce in violation of the commerce clause; (2) Santa Monica may impose only a fee that does not exceed the costs of any city services provided in connection with the pipeline and the reasonable value of the property rights surrendered to Shell in the franchise; (3) the fee violates the California Constitution; (4) Santa Monica violated the federal and state equal protection clauses by discriminating between Shell and other grantees of substreet easements; and (5) federal and state law preempt Santa Monica's attempt to impose any safety standards on the pipeline. Shell also sought permanent injunctive relief, *inter alia,* that Santa Monica (1) may not prevent Shell from transporting crude oil in the pipeline or otherwise interfere "with Shell's right to transport crude oil by pipeline through the City"; (2) may impose a fee based only on the reimbursement/compensation costs described above; and (3) may not impose any pipeline safety standards.

On June 12, 1986, the district court granted summary judgment in favor of Santa Monica in part and in favor of Shell in part. On the commerce clause issues, the court principally held that Santa Monica is a market participant in the area of oil transportation and thus is not subject to commerce clause restrictions. Second, the court held that the California Constitution did not bar the proposed fee. Finally, the court held that federal law preempts Santa Monica's attempt to impose any safety standards. Both parties filed timely appeals.

## STANDARD OF REVIEW

This court reviews de novo a grant of summary judgment and any determinations of federal and state law. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 629–30 (9th Cir.1987). We must determine whether, viewing the evidence in the light most favorable to the nonmoving party, there remains no genuine

---

**2.** Santa Monica alleged that nearly all of these cities were general law cities subject to a franchise fee formula under the California Public Utilities Code § 6231 (West Supp.1987). Santa Monica is a charter city, *see Pines v. City of Santa Monica,* 29 Cal.3d 656, 630 P.2d 521, 175 Cal.Rptr. 336 (1981), which it asserts is not required to apply the PUC formula.

**3.** The study emphasized the 1600–foot vertical drop in the pipeline just north of the city boundary, which would increase both the pipeline pressure within Santa Monica and the volume of oil spilled in the event of a rupture.

issue of material fact for trial and the moving party is entitled to judgment as a matter of law. *Id.* at 630.

## DISCUSSION

### I. *The Federal Commerce Clause Issues*

#### A. *The Market Participant Doctrine*

Shell's primary challenge is that the $237,000 annual fee violates the federal commerce clause because it places an unreasonable burden on interstate commerce. By its own terms, the commerce clause grants Congress power "[t]o regulate Commerce ... among the several States." U.S. Const. art. I, § 8, cl. 3. The present case does not involve an affirmative exercise of that power by Congress insofar as the route of the pipeline or the amount of the fee is concerned.[4] However, even in the absence of affirmative congressional action, the commerce clause prohibits states from taking certain action respecting interstate commerce. *CTS Corp. v. Dynamics Corp. of Am.,* — U.S. —, 107 S.Ct. 1637, 1648, 95 L.Ed.2d 67 (1987). The Court's interpretation of " 'these great silences of the Constitution,' " *id.* (quoting *H.P. Hood & Sons, Inc. v. Du Mond,* 336 U.S. 525, 535, 69 S.Ct. 657, 663, 93 L.Ed. 865 (1949)), has sprung primarily from a concern to avoid the Balkanization of commerce among the states. *See Hughes v. Oklahoma,* 441 U.S. 322, 325–26, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250 (1979); *see also* Regan, *The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause,* 84 Mich.L.Rev. 1091, 1094–95 (1986) (arguing that the dormant commerce clause is concerned primarily with purposeful economic protectionism). Yet, as the Court itself recently stated, its dormant commerce clause jurisprudence "has not always been easy to follow." *CTS Corp.,* 107 S.Ct. at 1648.

In the present case, the district court granted Santa Monica's motion for summary judgment on the franchise fee question on the ground that Santa Monica acted as a "market participant" that is not subject to the restrictions of the dormant commerce clause. Under the Court's market participant doctrine, if a state or state subdivision acts as a market participant rather than as a market regulator, the commerce clause does not " 'require independent justification' " for any protectionist practices. *White v. Massachusetts Council of Constr. Employers, Inc.,* 460 U.S. 204, 207, 103 S.Ct. 1042, 1044, 75 L.Ed.2d 1 (1983) (quoting *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 809, 96 S.Ct. 2488, 2497, 49 L.Ed.2d 220 (1976)). However, the key distinction between "market regulator" and "market participant," *see, e.g., South-Central Timber Dev., Inc. v. Wunnicke,* 467 U.S. 82, 93, 104 S.Ct. 2237, 2243, 81 L.Ed.2d 71 (1984) (plurality), though clearly defined in theory, has occasioned considerable dispute in application in the four principal Supreme Court cases. *See Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976) (6–3 decision by Powell; White in dissent); *Reeves, Inc. v. Stake,* 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980) (5–4 decision by Blackmun; Powell and White in dissent); *White,* 460 U.S. 204, 103 S.Ct. 1042 (7–2 decision by Rehnquist; Blackmun and White in dissent); *Wunnicke,* 467 U.S. 82, 104 S.Ct. 2237 (4–2–2 decision by White, joined by Blackmun; Powell concurrence in result; Rehnquist dissent). For reasons discussed below, we hold that Santa Monica has not acted as a market participant for purposes of the dormant commerce clause.

This case falls somewhere between the paradigm examples of market regulator and market participant. *Cf. Reeves,* 447 U.S. at 439 n. 12, 100 S.Ct. 2278, n. 12 ("When a State buys or sells, it has the attributes of both a political entity and a private business."). Santa Monica has not acted as a paradigm market regulator, as it would if it adopted an ordinance regulating the fees for all oil pipelines within the city.

---

**4.** *See* 49 U.S.C. App. § 2001(4) (1982) (expressly providing that the Secretary of Transportation does not have authority to prescribe the location or routing of any oil pipeline facility); 49 U.S.C.A. § 1682a (Supp.1987) (authorizing the Secretary of Transportation to establish pipeline safety user fee schedule for regulatory and enforcement activity under the Hazardous Liquid Pipeline Safety Act, but saying nothing on easement fees).

Santa Monica has independently negotiated a franchise agreement with Shell and has not prohibited private landowners in the city from selling easements to Shell. Hence, Santa Monica urges the position that it should be deemed a market participant because the franchise relationship with Shell is contractual. But contractual privity does not insulate a state or local body from commerce clause scrutiny. *Wunnicke,* 467 U.S. at 97, 104 S.Ct. at 2245 (holding that a state may not impose requirements with "a substantial regulatory effect outside of that particular market" merely because it can use its economic power to impose a requirement upon someone with whom it is in contractual privity); *see Golden State Transit Corp. v. City of Los Angeles,* 475 U.S. 608, 106 S.Ct. 1395, 1400–01, 89 L.Ed.2d 616 (1986); *Wisconsin Dep't of Indus., Labor & Human Relations v. Gould Inc.,* 475 U.S. 282, 106 S.Ct. 1057, 1062–64, 89 L.Ed.2d 223 (1986).

Santa Monica argues that it has entered the particular market for the transportation of crude oil. The city controls easements in the area beneath city streets, a commodity with value that it may sell to Shell. The city thus competes with other entities that also might supply Shell's needs—private landowners in Santa Monica who may sell easements under their land, neighboring municipalities and private landowners, and tank truck and barge operators.

Although Santa Monica's argument is not without considerable intuitive appeal, this court has previously rejected a similar argument in a related context. In *Western Oil & Gas Ass'n v. Cory,* 726 F.2d 1340 (9th Cir.1984), *aff'd per curiam by an equally divided Court,* 471 U.S. 81, 105 S.Ct. 1859, 85 L.Ed.2d 61 (1985), this court held that the State of California did not act as a market participant in its attempt to impose a fee for the transportation of crude oil from offshore oil rigs across state-owned tidal and submerged lands. The court reasoned that California did not participate in a "market" in the sense intended under the Supreme Court's dormant commerce clause jurisprudence because the state held the land by virtue of its sovereign capacity and the state commission had a virtual monopoly over the sale of easements on tidal and submerged lands. *Id.* at 1343. The court reached this conclusion even though alternatives arguably existed to the pipeline route over state lands, albeit with varying degrees of economic feasibility. In particular, the pipeline operators apparently could have sought a pipeline route over certain tidal lands that the state did not own, *see id.,* or transported the oil by barge. The court also observed: "This control over the channels of interstate commerce permits the State to erect substantial impediments to the free flow of commerce." *Id.*

As the district court recognized, the present case is distinguishable from *Cory* insofar as California had a stronger monopoly position than Santa Monica has. Shell concedes the existence of alternatives to a pipeline under Santa Monica streets. However, like *Cory,* this case involves lands held in a sovereign capacity that are recognized transportation corridors for commerce. As the court recognized in *Cory,* restrictions on publicly controlled transportation corridors raise the dormant commerce clause concern for impediments to the free flow of commerce. *See* Regan, *supra,* at 1184 (discussing "the special importance of an effective transportation network" to interstate commerce). We would find it untenable if a state or its subdivision could allocate rights to the use of publicly held transportation corridors in a manner that discriminated against interstate commerce in favor of intrastate commerce. *See West v. Kansas Natural Gas Co.,* 221 U.S. 229, 262, 31 S.Ct. 564, 574, 55 L.Ed. 716 (1911) (invalidating a state attempt to refuse to grant underground pipeline easements across state highways to foreign corporations, while granting similar easements to domestic corporations for intrastate transportation of the same commodity, when the apparent purpose was to limit export of natural gas produced in state).

■ We therefore conclude that, following *Cory,* Santa Monica is not a market participant in the setting of franchise fees

for easements under public streets.[5] Santa Monica contends that such a holding in effect would vest a private company with the power of eminent domain, or, alternatively, vest a private company with the power to dictate the terms on which it uses substreet property. We reject these contentions. Our holding that Santa Monica is not a market participant means only that in deciding whether, or on what terms, to grant a franchise for the use of public streets the city may not burden interstate commerce in a manner that violates the dormant commerce clause.[6]

### B. The Dormant Commerce Clause

Our conclusion that Santa Monica has not acted as a market participant does not end our inquiry. We must also determine whether the proposed franchise fee is invalid under a traditional dormant commerce clause analysis. At the outset, we note that this case does not involve either of the two primary objects with which the commerce clause is concerned—statutes that discriminate against interstate commerce and statutes that adversely affect interstate commerce by subjecting activities to inconsistent regulations. *CTS Corp.*, 107 S.Ct. at 1648–49; *id.* at 1652 (Scalia, J., concurring). First, Santa Monica has not acted to restrict the flow of goods or natural resources from being shipped into or outside of its boundaries in order to protect producers or suppliers within the city. *See, e.g., Hughes v. Oklahoma*, 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979); *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970); *West*, 221 U.S. 229, 31 S.Ct. 564. Santa Monica has not acted to favor domestically produced crude oil over that produced outside of Santa Monica; none is produced in Santa Monica. In addition, Shell has not presented any evidence that Santa Monica has treated any local oil pipeline operators preferentially. The record shows that Shell is the only company operating an oil pipeline in Santa Monica.[7] The fact that the prac-

---

**5.** We are mindful of the fact that franchising is, as a general matter, a traditional governmental function and that members of the Court have indicated that the market participant doctrine rests in part on considerations of state sovereignty. *See Reeves*, 447 U.S. at 438–39, 100 S.Ct. at 2278 (Blackmun, J.); *accord White*, 460 U.S. at 207 n. 3, 103 S.Ct. at 1044 n. 3 (Rehnquist, J.). "It follows easily that the intrinsic limits of the Commerce Clause do not prohibit state marketplace conduct that falls within this sphere" of " 'integral operations in areas of traditional governmental functions.'" *Reeves*, 447 U.S. at 438 n. 10, 100 S.Ct. at 2278 n. 10. We believe, however, that Santa Monica has not engaged in "marketplace conduct" within the meaning of the market participant exception and that the city's action with respect to transportation corridors is "the kind of action with which the Commerce Clause is concerned." *Alexandria Scrap*, 426 U.S. at 805, 90 S.Ct. at 2495; *see also* Regan, *supra*, at 1198–99 n. 210 (arguing that *Wisconsin Dep't of Indus., Labor & Human Relations v. Gould Inc.*, 475 U.S. 282, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986), "reveals that the state-as-market-participant doctrine is *not* aptly regarded as a doctrine about 'state sovereignty' "); *cf. Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985) (Blackmun, J.) (overturning *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), and restricting scope of state sovereignty in the face of affirmative congressional action under the commerce clause). We observe that this case involves only substreet easements controlled by the city in its sovereign capacity. *See Cory*, 726 F.2d at 1343. We have no occasion to decide what restrictions, if any, the dormant commerce clause may place on the sale of property interests in land purchased or acquired by the city through its entry into the real estate market.

**6.** Hence, we have no difficulty acknowledging the legitimacy of state laws that generally authorize a municipality to grant a franchise under public streets on such "terms and conditions ... whether governmental or contractual in character, as in the judgment of the legislative body are to the public interest," *see* Cal.Pub.Util.Code § 6203 (West 1965), or that authorize a city to require that a nonpublic pipeline utility, "if granted the franchise, will pay to the municipality...an annual franchise fee in an amount agreed to by the applicant and the municipality," *see id.* § 6231 (West Supp.1987). *See Sunset Tel. & Tel. Co. v. City of Pasadena*, 161 Cal. 265, 284, 118 P. 796, 804 (1911).

**7.** Shell has presented evidence that Santa Monica has franchise agreements with two public utilities at lower fees than the fee proposed in its renewal agreement. Southern California Edison Company pays an annual fee of approximately $1,516 per mile for its substreet electric power lines. Southern California Gas Company pays an annual fee of approximately $1,004 per mile for its substreet natural gas mains. Santa Monica's proposed fee for Shell is approximately $59,000 per mile.

Shell's equal protection argument is without merit. Santa Monica has legitimately distin-

tical burden of Santa Monica's actions with respect to oil pipeline operators may fall on nonlocal companies because of the absence of local oil pipeline operators does not establish discrimination against interstate commerce. *CTS Corp.*, 107 S.Ct. at 1649.

Second, Santa Monica's franchise fee poses no threat of inconsistent regulation. The amount of a franchise fee is unlike regulations on the method or mode of transportation that the Court has struck down. *See Kassel v. Consolidated Freightways Corp.*, 450 U.S. 662, 671, 101 S.Ct. 1309, 1316, 67 L.Ed.2d 580 (1981) (plurality) (invalidating regulation of truck size on interstate highways); *Southern Pac. Co. v. Arizona*, 325 U.S. 761, 773–74, 65 S.Ct. 1515, 1522, 89 L.Ed. 1915 (1945) (noting the "confusion and difficulty" that would attend the "unsatisfied need for uniformity" in setting maximum limits on train lengths). Interstate transportation of oil is not impeded by the fact that states, counties, cities, and private landowners may assess *different* charges for the use of land under or through which a pipeline passes.

Shell's primary challenge is that Santa Monica's proposed franchise fee, viewed as a "user fee" or "rent," is disproportionate to the value of the city land and services rendered.[8] The Supreme Court has traditionally upheld user fees only if they bear a reasonable relationship to the government's costs. *See Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972) (upholding airport user fee collected to defray costs of airport construction and maintenance, where fee was apportioned to reflect amount of use and was not excessive in relation to the actual costs incurred); *Clark v. Paul Gray, Inc.*, 306 U.S. 583, 598–600, 59 S.Ct. 744, 752–53, 83 L.Ed. 1001 (1939) (upholding fee on caravan traffic that was not shown to be manifestly disproportionate to the cost of using the highways); *Ingels v. Morf,* 300 U.S. 290, 57 S.Ct. 439, 81 L.Ed. 653 (1937) (striking down a fee on caravan traffic found excessive in comparison to costs of using highway); *Interstate Transit, Inc. v. Lindsey,* 283 U.S. 183, 51 S.Ct. 380, 75 L.Ed. 953 (1931) (invalidating user fee that was proportioned solely to earning capacity of vehicles, not number of passengers, mileage, or wear and tear on road incident to vehicles' use).

Similarly, in *Cory*, we made clear that user fees must be proportional to the value of the services rendered. There, we considered whether California's attempt to impose a fee for an easement across state-owned submerged tidelands violated the dormant commerce clause. The "rent" for this easement was a flat 8% of the land's appraised value, plus an amount proportional to the volume of oil transported in the pipeline. We found no defect in the flat fee, but held that the volumetric charge unduly burdened interstate commerce, because as a "user fee" it was not apportioned to reflect the benefits conferred by the state. *Cory*, 726 F.2d at 1343–45.

---

guished between public utilities, which provide a public benefit to all of its citizens, and Shell's private pipeline operation, which does not. Moreover, the record does not reveal when, or under what circumstances, the franchise fees for the public utilities were set; property values may have increased dramatically since that time. Finally, oil pipelines may present different hazards than gas and electric lines and, accordingly, expose the city to greater liability. We therefore reject Shell's equal protection argument.

We also note that Shell is unable to maintain a challenge under the privileges and immunities clause of the federal Constitution, because corporations are not "citizens" for purposes of that clause. *See Hemphill v. Orloff,* 277 U.S. 537, 548–50, 48 S.Ct. 577, 579, 72 L.Ed. 978 (1928).

8. We agree with Shell's characterization of the franchise fee as a user fee or rent, as opposed to a tax. Whereas the level of taxation of a given activity lies almost exclusively within the determination of the taxing jurisdiction, *see Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981) (severance tax on coal mined in state upheld), Santa Monica has not acted in such a manner. By its own admission, it seeks to secure compensation for the Shell's use of substreet easement; it has not imposed a city-wide tax on oil pipeline operators regardless of whether the pipelines traverse publicly or privately owned land.

■ The district court upheld the $59,-000 per mile fee, finding that it resembled the portion of the user fee upheld in *Cory*. We agree with the district court that *Cory's* user fee analysis does not require invalidation of the proposed franchise fee because the fee was valued according to a reasonable percentage of the appraised value of land abutting the pipeline within the city. Because Santa Monica's fee is based on an evenhanded formula and not graduated by the amount of business done, it is not a "customs duty" on goods passing through its jurisdiction like the volumetric charge held invalid in *Cory*. Shell does not dispute Santa Monica's contention that the proposed franchise fee was based on an appraisal of 50% of the property value of the abutting land, capitalized at an annual rate of 12.5%.

As in *Cory*, we are unable to conclude that this valuation is "'manifestly disproportionate to the services rendered.'" *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 621–22 & n. 12, 101 S.Ct. 2946, 2955–56 & n. 12, 69 L.Ed.2d 884 (1981) (quoting *Clark*, 306 U.S. at 599, 59 S.Ct. at 753). We conclude that Shell has not met its burden at summary judgment of showing that Santa Monica has discriminated against interstate commerce. Accordingly, we affirm the district court's grant of summary judgment.

## II. *The State Constitutional Issue*

Shell also argues that the California Constitution precludes imposition of the proposed fee. *See* Cal. Const. art. XI, § 7 ("A county or city may make and enforce *within its limits* all local, police, sanitary, and other ordinances and regulations not in conflict with general laws.") (emphasis added); *id.* art. I, § 7 (equal protection provision). In *City of Los Angeles v. Shell Oil Co.*, 4 Cal.3d 108, 480 P.2d 953, 93 Cal.Rptr. 1 (1971), the California Supreme Court identified principles that restrict the ability of local governments to tax intercity activity:

> [I]n spite of the absence of a specific "commerce clause" in our state Constitution, other provisions in that Constitution —notably those provisions forbidding extraterritorial application of laws and guaranteeing equal protection of the laws ...—combine with the equal protection clause of the federal Constitution to proscribe local taxes which operate to unfairly discriminate against intercity businesses by subjecting such businesses to a measure of taxation which is not fairly apportioned to the quantum of business actually done in the taxing jurisdiction. On the other hand, those constitutional principles do not *prohibit* local license taxes upon businesses "doing business" both within and outside the taxing jurisdiction; as long as such taxes are apportioned in a manner by which the measure of tax fairly reflects that proportion of the taxed activity which is actually carried on within the taxing jurisdiction, no constitutional objection appears. However, and conversely, no measure of apportionment can satisfy the constitutional standard if the measure of tax is made to depend upon a factor which bears no fair relationship to the proportion of the taxed activity actually taking place within the taxing jurisdiction.

*Id.* at 124, 480 P.2d at 963, 93 Cal.Rptr. at 11. This case implicates neither the concern for extraterritorial application of local laws nor the problem of discrimination against intercity commerce.

*Shell* and several related cases are concerned primarily with the *method* of taxation: local taxes on a specified activity must be apportioned based on the amount of such activity conducted within and outside city boundaries. Such apportionment ensures that a local government does not apply its tax laws to extraterritorial activity and thus expose a business to double tax liability for the same activity. *See id.* at 118, 480 P.2d at 959, 93 Cal.Rptr. at 7. For example, in *Shell* the court invalidated a city business tax based on total gross receipts from a company's sales activities both within and outside the city. *Id.* at 124–26, 480 P.2d at 963–65, 93 Cal.Rptr. at 11–13. In *City of Los Angeles v. Belridge Oil Co.*, 42 Cal.2d 823, 831, 271 P.2d 5, 10 (1954), the court held that a city could tax

the activity of selling within the city in spite of various extraterritorial events that contributed to such receipts. In *Carnation Co. v. City of Los Angeles*, 65 Cal.2d 36, 38–40, 416 P.2d 129, 130–32, 52 Cal. Rptr. 225, 226–28 (1966), the court upheld a city tax on manufacturing, processing, or handling goods within its boundaries that was based on the amount of gross receipts from sales of those goods. Finally, in *Volkswagen Pac., Inc. v. City of Los Angeles*, 7 Cal.3d 48, 58–59, 496 P.2d 1237, 1244–45, 101 Cal.Rptr. 869, 876–77 (1972), the court held that a city tax on wholesale selling activity that reached all gross receipts must be apportioned so as to exclude extraterritorial selling activities.

■ In this case, Santa Monica's proposed fee does not "depend upon a factor which bears no fair relationship to the proportion of the taxed activity taking place within the taxing jurisdiction." *Shell*, 4 Cal.3d at 124, 480 P.2d at 963, 93 Cal.Rptr. at 11. The proposed flat fee is indifferent to the area or number of miles the pipeline traverses outside the city's boundaries, the volume of oil that passes through the pipeline, and Shell's receipts from its petroleum sales. Shell has not met its burden of showing that this formula has extraterritorial application. *See Shell*, 4 Cal.3d at 126, 480 P.2d at 965, 93 Cal.Rptr. at 13 (holding that a plaintiff must show by " 'clear and cogent evidence' " that an apportionment formula in fact taxed extraterritorial activity or values) (quoting *Butler Bros. v. McColgan*, 315 U.S. 501, 507, 62 S.Ct. 701, 704, 86 L.Ed. 991 (1942)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986) (holding that at summary judgment "the judge must view the evidence presented through the prism of the substantive evidentiary burden").

Shell advances a far broader meaning of extraterritorial application of local law that includes "extraterritorial effect." It argues that, because Santa Monica's actions may have an impact on areas outside its boundaries (such as causing Shell to decide to put its pipeline through another city), Santa Monica is thereby applying its law beyond its boundaries. Any action by a city, such as the enactment of a zoning ordinance or a decision to raise property taxes, will have extraterritorial impacts in this sense. Inaction, for that matter, would also have such extraterritorial effects. Nothing in *Shell*, the related cases, or the text of article XI, § 7 supports such a sweeping interpretation of the concern for extraterritorial application of local law.

The core of Shell's argument under the state constitution concerns the amount of the fee, not its formula. Thus, the argument must proceed on the basis of the *Shell* court's second concern, intercity discrimination. This concern would prohibit a city from setting higher fees for intercity than for intracity oil pipelines. As discussed above, however, Shell has not established that Santa Monica has imposed franchise fees on a discriminatory basis. *See supra* pp. 1057–58 & n. 7.[9] We therefore affirm the district court's grant of summary judgment on the state constitutional issue.

### III. The Preemption Issue

#### A. Ripeness

On cross-appeal, Santa Monica argues that the preemption issue is not ripe because, at this stage of the negotiations, it is not clear whether a new franchise agreement, if ever executed, will contain particular safety requirements that conflict with federal or state law. Santa Monica mischaracterizes Shell's primary challenge. Shell requests a declaratory judgment that Santa Monica may not impose *any* safety standards. That issue is ripe.

The doctrine of ripeness "prevents courts from deciding theoretical or abstract questions that do not yet have a concrete impact on the parties." *Assiniboine & Sioux Tribes v. Board of Oil & Gas Conservation*, 792 F.2d 782, 787 (9th Cir.1986). The doctrine requires an inquiry into " 'the fit-

---

**9.** A fairly apportioned tax may be high as long as it is not confiscatory. *See General Motors Corp. v. City of Los Angeles*, 5 Cal.3d 229, 243 n. 17, 486 P.2d 163, 172 n. 17, 95 Cal.Rptr. 635, 644 n. 17 (1971). Shell has not alleged that the fee is confiscatory.

ness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Trustees for Alaska v. Hodel*, 806 F.2d 1378, 1381 (9th Cir. 1986) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967)). Hence, ripeness is "'peculiarly a question of timing'" that requires a court to "look at the facts as they exist today in evaluating whether the controversy ... is sufficiently concrete to warrant [judicial] intervention." *Assiniboine*, 792 F.2d at 788 (quoting *Buckley v. Valeo*, 424 U.S. 1, 114–17, 96 S.Ct. 612, 680–81, 46 L.Ed.2d 659 (1976)).

■ The preemption issue posed by Shell is ripe for review because the disagreement over whether Santa Monica may impose any safety standards is clearly framed by the facts of this case. The city has unambiguously indicated its resolve to require at least some safety standards in the new franchise agreement. This issue has a concrete impact on the parties because the safety standards represent a major obstacle to the execution of a new agreement. The issue is not unripe because a mere possibility exists that a final agreement might not contain any safety standards or that no franchise would be granted at all. *See National Basketball Ass'n v. SDC Basketball Club, Inc.*, 815 F.2d 562, 565–66 & n. 2 (9th Cir.1987). We conclude that the question whether Santa Monica may impose any safety standards in the new franchise agreement is ripe. *See California Coastal Comm'n v. Granite Rock Co.*, ––– U.S. –––, 107 S.Ct. 1419, 94 L.Ed.2d 577 (1987) (no ripeness problem noted in suit seeking declaration that federal law preempted a state agency from imposing *any* environmental standards in a mining permit, even though plaintiff had not secured a permit).[10]

### B. The Municipal-Proprietor Exemption from Preemption

Santa Monica contends that preemption analysis should not apply to its attempt to impose safety standards in its franchise agreement with Shell under the "municipal-proprietor" exemption. This theory stems both from the idea that preemption is a supremacy clause doctrine governing the actions of two sovereigns in our federal system, which does not apply to the actions of a private individual, and from practical concerns that a municipality, when acting as a proprietor, may have good reason to protect itself from liability resulting from the actions it authorizes. *See Santa Monica Airport Ass'n v. City of Santa Monica*, 659 F.2d 100, 103–04 & n. 5 (9th Cir.1981). Three appellate courts have suggested the existence of such a theory. *See City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 635–36 n. 14, 93 S.Ct. 1854, 1860–61 n. 14, 36 L.Ed.2d 547 (1973) ("[A]uthority that a municipality may have as a landlord is not necessarily congruent with its police power. We do not consider here what limits, if any, apply to a municipality as a proprietor."); *Santa Monica Airport Ass'n*, 659 F.2d at 103–04 (noting "municipal-proprietor exemption from federal preemption," but holding that Congress did not intend to preempt a municipality from imposing noise standards at its own airport); *British Airways Bd. v. Port Auth.*, 558 F.2d 75, 83–84 (2d Cir.1977). The theory proceeds on the premise that a private landowner may grant an easement to a pipeline operator on condition of compliance with safety standards that are more stringent than federal law.

The key inquiry under the municipal-proprietor exemption would be to determine whether Santa Monica is acting in a regulatory or proprietary capacity. As discussed in the context of the market participant exception, a city may not use the guise of privity of contract to conduct otherwise forbidden regulatory activity. *See Wunnicke*, 467 U.S. at 97, 104 S.Ct. at 2245. Similarly, in the municipal-proprietor setting, a city may not condition a franchise renewal upon the settlement of a labor

---

**10.** We do not decide whether a challenge to the inclusion of any particular safety standard in the franchise agreement would be ripe. Shell has not challenged any particular standards.

*See Granite Rock*, 107 S.Ct. at 1432 (refraining from deciding whether any particular standards that might be imposed in a future permit would conflict with federal law).

dispute, because such action is tantamount to regulating third-party relations preempted by federal labor law. *See Golden State Transit Corp.*, 106 S.Ct. at 1400-01; *see also Gould Inc.*, 106 S.Ct. at 1062-64 (holding that a state may not prohibit state purchases from repeat labor law violators because federal law preempts labor law enforcement). Presumably, our inquiry would involve a pragmatic judgment as to whether Santa Monica was attempting to regulate third-party relations in the market as in *Wunnicke, Golden State Transit,* and *Gould,* or whether its actions to limit exposure to municipal liability were sufficiently tied to the "immediate transaction." *Cf. Wunnicke,* 467 U.S. at 98, 104 S.Ct. at 2246 (noting that "simply as a matter of intuition a state market participant has a greater interest as a 'private trader' in the immediate transaction than it has in what its purchaser does with the goods after the State no longer has an interest in them"). However, we need not decide these close questions because, as discussed below, we conclude that federal law does not preempt Santa Monica from imposing all safety standards in a franchise agreement for an intrastate pipeline.

### C. The Hazardous Liquid Pipeline Safety Act

The district court held that the Hazardous Liquid Pipeline Safety Act of 1979 ("HLPSA"), 49 U.S.C.A. §§ 2001-2014 (Supp.1987), preempts Santa Monica from imposing all safety standards on an *intra*state pipeline. Our review of this legal conclusion is de novo. *Humboldt Oil Co. v. Exxon Co.*, 823 F.2d 373, 374 (9th Cir. 1987). We determine the scope of federal preemption in an area by applying the traditional two-pronged inquiry:

> If Congress evidences an intent to occupy a given field, any state law falling within that field is pre-empted. If Congress has not entirely displaced state regulation over the matter in question, state law is still pre-empted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.

*Granite Rock,* 107 S.Ct. at 1425 (quoting *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 621 (1983) ) (citations omitted); *see also California Fed. Sav. & Loan Ass'n v. Guerra,* ___ U.S. ___, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987) (preemption where there is (1) express statement, (2) sufficiently comprehensive regulation to infer that Congress left no room for state regulation, or (3) conflict).

As noted in our discussion of ripeness, this appeal concerns only the first prong. Hence, as in *Granite Rock,* we must search for some express statement or other clear indication of congressional intent to preempt Santa Monica's attempt to impose all safety standards. *See Granite Rock,* 107 S.Ct. at 1426 ("[I]t is appropriate to expect an administrative regulation to declare any intention to pre-empt state law with some specificity."); *id.* at 1432 (applying traditional analysis of search for "a congressional expression of intent to preempt"). Although the search for evidence of congressional intent to preempt all state regulation can be an imprecise undertaking, we believe that the provisions of the HLPSA do not support the district court's conclusion.[11]

The HLPSA directs the Secretary of Transportation to establish "minimum Federal safety standards for the transportation of hazardous liquids and pipeline facilities." 49 U.S.C. App. § 2002(a) (1982). The statute expressly preempts states from imposing any additional safety standards on *inter*state pipelines: "No State agency may adopt or continue in force any safety standards applicable to interstate pipeline facilities or the transportation of hazardous liquids associated with such facilities." *Id.*

---

11. The district court itself did not engage in the kind of searching inquiry undertaken in *Granite Rock.* Instead, it relied on two letters prepared by a California state deputy attorney general and a Department of Transportation official. These letters incorrectly assumed that the existence of congressional power to regulate all pipelines that affect interstate commerce means that Congress has preempted all state and local regulation, subject only to such delegation of its authority as it may indicate.

§ 2002(d). However, the act expressly permits additional state regulation of *intra*state pipelines: *"Any State agency* may adopt additional or more stringent safety standards for intrastate pipeline facilities and the transportation of hazardous liquids associated with such facilities, if such standards are compatible with the Federal standards issued under this chapter." *Id.* (emphasis added).

This distinction between interstate and intrastate pipeline facilities parallels the one made in the Natural Gas Pipeline Safety Act of 1968 ("NGPSA"), 49 U.S.C.A. §§ 1671–1686 (1976 & Supp.1987), on which the HLPSA was modeled. *See* H.R.Rep. No. 97–89 (Pt. I), 97th Cong., 2d Sess. 2, *reprinted in* 1982 U.S.Code Cong. & Admin.News 4480, 4481; S.Rep. No. 96–182, 96th Cong., 1st Sess. 5, *reprinted in* 1979 U.S.Code Cong. & Admin.News 1971, 1975, 1989. The House report for the NGPSA explained:

> The relationship of Federal-State regulatory authority created by this bill differs as between local pipelines and interstate transmission lines. In the latter area, the lines of a single transmission company may traverse a number of States and uniformity of regulation is a desirable objective. For this reason, section 3 provides for a Federal preemption in the case of interstate transmission lines.
>
> On the other hand, in the case of local lines ..., States may establish additional or more stringent standards, provided they are not inconsistent with the Federal minimum standards. The committee

has provided for this different treatment because each State authority is uniquely equipped to know best the special aspects of local pipeline safety which are particularly applicable to that community.

H.R.Rep. No. 1390, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Admin.News 3223, 3241; *see id.* at 3236.

In this case, the district court determined, and the parties agree, that whether the pipeline is interstate or intrastate in this case turns on a disputed issue of fact —the shipper's intent. *See Burlington Northern, Inc. v. Weyerhaeuser Co.,* 719 F.2d 304, 307–10 (9th Cir.1983). Viewing the evidence in the light most favorable to Santa Monica, the district court assumed that the pipeline was intrastate.[12] Thus, Shell would be entitled to summary judgment on the federal preemption issue only if Santa Monica is *not* "[a]ny State agency" under 49 U.S.C. App. § 2002(d) (1982).

The HLPSA does not define the term "State agency." The two letters on which the district court relied[13] argued that "State agency" in § 2002(d) means "state" as opposed to "municipal" or "local." This reading has two significant problems. First, the HLPSA itself specifically contemplates that "municipalities" may be "State agencies." *See* 49 U.S.C.App. § 2012(a)(9)(A), § 2012(a)(10)(A) (1982); *cf. id.* § 1674(a) (same under the NGPSA). Second, applying the restrictive reading of "State agency" to the sentence in § 2002(d) concerning *inter*state pipelines leads to the anomalous conclusion that the HLPSA preempts state-level agencies from regulat-

---

**12.** The HLPSA regulations define an interstate pipeline as "a pipeline or that part of a pipeline that is used in the transportation of hazardous liquids in interstate or foreign commerce." 49 C.F.R. § 195.2 (1986). An intrastate pipeline is defined as "a pipeline or that part of a pipeline to which this part applies that is not an interstate pipeline." *Id.* An appendix states that a pipeline that begins off-shore on the outer continental shelf and enters a state is an interstate pipeline. *See* 49 C.F.R. pt. 195 app. A, ex. 7 (1986). But a pipeline that merely transports oil from two points within a state may be an intrastate pipeline. *See id.* ex. 1; *see also Southern Pac. Pipe Lines, Inc. v. U.S. Dep't of Transp.,* 796 F.2d 539, 542 (D.C.Cir.1986) (lateral pipelines used solely for intrastate carriage are in-

trastate, even if physically connected to interstate pipeline facility). Although on appeal Shell has sought to introduce a letter from a Department official stating that the pipeline is interstate, the record in this case does not conclusively establish whether the pipeline is interstate or intrastate. Thus, like the district court, we assume for the purpose of summary judgment that the pipeline is intrastate.

We note that, in the event that the pipeline is determined to be interstate, the district court would then need to address the municipal-proprietor exemption from preemption.

**13.** *See supra* note 11.

ing interstate pipelines, while saying nothing about municipalities or other local bodies. The only sensible reading of this provision is that the HLPSA preempts regulation of *inter*state pipelines by all "State agencies"—including both state and local bodies. This inclusive reading of the term "State agencies" would similarly apply to the other sentence in § 2002(d) concerning *intra*state pipelines. "Congress could not have intended the same phrase to have different meanings in two consecutive sentences." *Southern Pac. Pipe Lines, Inc. v. United States Dep't of Transp.*, 796 F.2d 539, 542 (D.C.Cir.1986) (referring to different phrase in § 2002(d)).

The district court adopted a different interpretation. It interpreted the term "State agency" in § 2002(d) to mean "[a]ny State agency" (including municipalities) to which regulatory authority has been delegated under § 2004(a). Under the HLPSA, the Secretary of Transportation must cede its authority to prescribe and enforce minimum federal standards for intrastate pipelines to a state agency that annually certifies that it has adopted and will enforce those minimum standards. 49 U.S.C.App. § 2004(a) (1982).[14] The district court's reading is also problematic. First, as in the foregoing analysis, this interpretation would result in the odd conclusion that § 2002(d) would preempt certified state agencies (whether state or municipal) from imposing additional standards on *inter*state pipelines, but would say nothing about uncertified state agencies (whether state or municipal).

Second, the bare fact is that § 2002(d) does not limit the term "[a]ny State agency" to certified state agencies. If Congress had intended to limit that term to state agencies that are certified under § 2004(a), one would have expected it to have done so expressly. Other provisions in the HLPSA expressly limit the term "State agencies" to agencies that are certified. *See, e.g., id.* §§ 2002(h), 2004(d)(1), 2009(a), 2012(a)(9)(A), 2014(b)(1). Other provisions refer to a "State agency" that is

not certified under § 2004(a). *See id.* §§ 2004(b), 2004(g), 2012(a)(10)(A). The passages in the legislative history discussing additional, compatible state standards do not restrict the authority to issue such standards only to state agencies that have been certified; the legislative reports acknowledge broadly, and without qualification, that states may impose additional, compatible standards. *See* H.R.Rep. No. 99–121 (Pt. I), 99th Cong., 2d Sess. 2, *reprinted in* 1986 U.S.Code Cong. & Admin. News 4978, 4979; H.R.Rep. No. 98–780 (Pt. I), 98th Cong., 2d Sess. 2, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3147, 3148; H.R.Rep. No. 97–89 (Pt. I), 97th Cong., 2d Sess. 2, *reprinted in* 1982 U.S. Code Cong. & Admin.News 4480, 4481. We acknowledge that some ambiguous evidence exists that at least would suggest a contrary conclusion. *See* 49 C.F.R. pt. 195 app. A, at 635 (1986); *Southern Pac. Pipe Lines*, 796 F.2d at 540 (suggesting in dicta, without discussion, that a state may impose additional safety ·standards on intrastate lines only after it has been certified under § 2004). For example, the appendix to the hazardous pipeline regulations states:

> [T]he HLPSA provides for a national hazardous liquid pipeline safety program with nationally uniform minimum standards and with enforcement administered through a Federal-State partnership. The HLPSA leaves to exclusive Federal regulation and enforcement "interstate pipeline facilities".... For ... "intrastate pipeline facilities," the HLPSA provides that the same Federal regulation and enforcement will apply unless a State certifies that it will assume those responsibilities. A certified State must adopt the same minimal standards but may adopt additional more stringent standards so long as they are compatible.

49 C.F.R. pt. 195 app. A, at 635 (1986). One fair reading of this passage is that the Department of Transportation believes that the HLPSA provides for *exclusive* federal authority over intrastate pipelines, unless a

---

**14.** California has designated its state fire marshal to be such a certified state agency. Cal. Gov't Code § 51010 (West Supp.1987).

state agency is certified. However, the passage may also reflect nothing more than the uncontested point that the HLPSA provides for exclusive *minimum* federal regulation and enforcement, unless a state agency is certified. *See also* 50 Fed.Reg. 39,013 (similar ambiguous passage). We do not believe that this ambiguous passage provides a clear indication of the Department's position on the issue posed in this case. We express no view on the extent to which a contrary interpretation of the HLPSA by the Department would affect our own interpretation of the HLPSA.

The Department's stated policy is "to allow states to assume as much responsibility for pipeline safety within their states as possible, subject only to the limitations of the HLPSA." 50 Fed.Reg. 39,008, 39,011 (1985); *see also* 49 U.S.C. App. § 2014(f) (1982) (providing that a violation of "any safety standard or practice of any State" shall be a violation of federal law "only to the extent that such standard or practice is not more stringent than the comparable Federal safety standard"); *cf. United Gas Pipeline Co. v. Terrebonne Parish Police Jury,* 319 F.Supp. 1138, 1139–42 (E.D.La. 1970) (holding that the NGPSA preempts state political subdivisions from regulating *inter*state gas pipelines, but observing in dicta that a local body could impose a compatible safety ordinance on local transmission lines), *aff'd per curiam,* 445 F.2d 301 (5th Cir.1971). Finally, the HLPSA authorizes the Secretary

> to consult with, and make recommendations to ... State *and local* governments ... for the purpose of developing and encouraging activities, *including the enactment of legislation,* ... to improve State *and local pipeline safety programs* relating to hazardous liquids.

49 U.S.C. App. § 2011(c) (1982) (emphases added). Thus, we see no apparent reason to give the unrestricted term "[a]ny State agency" in § 2002(d) the restricted meaning of "[a]ny certified State agency."

The district court's conclusion that the HLPSA preempts municipalities (or other noncertified state agencies) from imposing additional, compatible safety standards on intrastate pipelines does not withstand the type of searching inquiry undertaken in *Granite Rock.* Accordingly, we hold that the HLPSA does not preempt Santa Monica from imposing all safety standards on intrastate pipelines and vacate the district court's grant of summary judgment in favor of Shell.[15] We note that our holding in no way authorizes Santa Monica to impose any particular safety standard. As in *Granite Rock,* the plaintiff's challenge to the agency's authority to impose *any* standards "was broad and absolute; our rejection of that challenge is correspondingly narrow." 107 S.Ct. at 1431. We have no occasion to decide, under the second prong of the preemption inquiry, whether the HLPSA would preempt any particular standard on the ground that it conflicts with federal law or is inconsistent with federal objectives.

## CONCLUSION

For the reasons discussed above, the district court's judgment in No. 86–6103 is affirmed: the proposed franchise fee does not violate the federal commerce clause or the analogous state constitutional provisions. The judgment in No. 86–6206 is vacated and remanded: assuming the pipeline is intrastate, the HLPSA does not preempt Santa Monica from imposing all safety standards. The case is remanded for consideration of whether the pipeline is interstate and whether state law preempts Santa Monica.

AFFIRMED IN PART, VACATED AND REMANDED IN PART.

WIGGINS, concurring separately:

I concur in the court's opinion, but believe that some of its unintended effects could have been resolved by a clear finding

---

**15.** Whatever preemption may exist must be rooted in the California Pipeline Safety Act ("CPSA"), Cal. Gov't Code §§ 51010–51020 (West Supp.1987). The district court did not address the question whether the CPSA preempts local bodies, and the parties have not briefed the issue on appeal. We leave this question for further development on remand.

that Shell's pipeline is in interstate commerce.

For the purposes of resolving the issues raised by Shell's commerce clause arguments, the court necessarily assumes that the pipeline is operating in an interstate fashion. This was for reviewing the summary judgment against Shell. But for the purposes of resolving Santa Monica's preemption arguments, we had to assume that the pipeline was in *intra*state commerce.

What I take issue with is the court's conclusion that the record is unclear on the pipeline's status as a part of interstate or intrastate commerce. I have no doubts that, as a matter of law, it is interstate and that the Hazardous Liquids Pipeline Safety Act (HLPSA), 49 U.S.C.A. §§ 2001–2014 (Supp.1987), preempts Santa Monica's safety regulations.

That the pipeline originates from the outer continental shelf (OCS) should be enough to validate this conclusion. See 49 C.F.R. pt. 195, app. A & ex. 7 (1986). The fact that the pipeline connects with other pipelines which terminate in other states seems to me also to be decisive. *Id.* ex. 4. Moreover, Shell's pipeline could not really be considered as a "delivery lateral," as this term was used by another appeals court, *Southern Pac. Pipe Lines, Inc. v. United States Dep't of Transp.*, 796 F.2d 539, 541 (D.C.Cir.1986), when it ruled that the operation in question was intrastate. *Id.* at 542. Rather, it seems clear that Shell's pipeline from Ventura County to the Wilmington refinery is a trunk line, originating from the OCS, its oil already in interstate commerce. The guidelines offered by the HLPSA should be enough to make this determination and no recourse need be made to the "intentionalist" theory which the parties, apparently, believe is controlling.

I would conclude that the pipeline operates in interstate commerce. Moreover, Santa Monica would not be exempted under some "municipal-proprietor" exception to the preemption doctrine, for the same reasons stated by the court in its discussion of why Santa Monica cannot avail itself of the "market participant" exception to the commerce clause.

This case is narrow in its reasoning, as it should be. But it also sounds a clarion call to Congress for action. It is true that Congress has not prevented the disruption of interstate traffic in petroleum products which Santa Monica's imposition of rent, if it were emulated by every municipality on the pipeline's course, presents. The only check on this ominous form of over-reaching by local authorities against politically unpopular enterprises, such as oil producers, is the vague notion of proportionality of rent to services provided by the city. Santa Monica did not, I agree, cross the line in this case. But I do have my doubts whether this decision addresses an invitation to like-situated localities in California (or Nevada and Alaska, for that matter), to press the limits of proportionality, and enter the realm of confiscation. Besides increasing prices to consumers of gasoline, the result of all this will be the "Balkanization" of the economy. This is more than a quaint and picturesque phrase describing a hypothetical danger. The Supreme Court intended it as a warning to deter the states from interfering in the national economy. *Hughes v. Oklahoma*, 441 U.S. 322, 325–26, 99 S.Ct. 1727, 1730–31, 60 L.Ed.2d 250 (1979). The danger of exorbitant rents on oil pipeline traffic and the resultant burden to commerce cannot be met in this court; it must be answered by Congress.